BECKER, Appellant, v. CITY OF MILWAUKEE and another, Respondents.

*November 2—December 1, 1959.*

For the appellant there was a brief by *Peck & Wittak* and *Kivett & Kasdorf,* attorneys, and *Fred D. Huber, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Huber* and *Mr. John J. Wittak.*

For the respondent city of Milwaukee there was a brief by *Walter J. Mattison,* city attorney, and *George A. Bowman, Jr.,* assistant city attorney, and oral argument by *Mr. Bowman.*

For the respondent Joseph H. Wichman there was a brief by *Bendinger, Hayes & Kluwin* of Milwaukee, and oral argument by *Gerald Hayes, Jr.*

FAIRCHILD, J. ■ *Liability of the plumbing contractor.* In the course of performing work for the owner of property abutting West Villard avenue, Wichman was required to dig a trench across the westbound roadway. He secured a permit from the city to do so, which, in turn, required him to fill the trench in compliance with certain specifications. After the fill was completed, a city inspector looked at it and approved it. Wichman claims that the approval constituted acceptance by the city, and relies upon a rule that an independent contractor is relieved from responsibility to persons for injuries suffered by them after he has completed his work and it has been accepted by his principal. *Delaney v. Supreme Investment Co.* (1947), 251 Wis. 374, 382, 29 N. W. (2d) 754.

The suggestion that this rule applies to the present case must be based upon the assumption that Wichman's rela-

tionship to the city was that of independent contractor to principal. That was doubtless the relationship between Wichman and the property owner, but the relationship to the city was essentially different. Wichman's work was not performed for the benefit of the city. The public had the right to use the roadway, and when the city granted the permit, it was temporarily limiting that right, and permitting the creation of a condition which would be dangerous if not properly restored. The city was acting primarily as a unit of government, protecting the interests of the traveling public in the safe use of the highway and of the property owner seeking a utility connection, as well as its own interests because of its duty to maintain its streets. Negligence in excavating and filling would directly endanger the safety of the traveling public, as well as burden the city. Under the theory of defendant Wichman, the approval of the city inspector would terminate any right of an injured member of the public to recover from the contractor for injuries caused by the contractor's negligence. We can see no sound policy reason for such a result.

One who lawfully makes an excavation in a public highway, but negligently fails to fill it properly, is liable to a traveler who is injured as a result. *Zimmer v. Schmitt* (1918), 167 Wis. 430, 167 N. W. 739. See also *Ptak v. Kuetemeyer* (1924), 182 Wis. 357, 196 N. W. 855, 197 N. W. 363; *Cummings v. Nelson* (1933), 213 Wis. 121, 250 N. W. 759.

The trench excavated by Wichman's employees had been 12 feet deep, and three feet wide. The street at that point consisted of two gravel or black-top roadways approximately 20 feet wide, with a center plot between them. The trench ran from a point in the center plot to a building site on the north side of the street, crossing the roadway for westbound traffic. After laying the pipe, the Wichman employees had inserted filling material in the trench, leaving it so that the surface of the fill was just a little bit higher than the surface

of the roadway. During the month of January, 1957, the fill sank so that for several weeks, there was a depression about six inches deep, and about three feet wide where the trench had been. The depression extended the entire width of the westbound roadway. On January 20th and 21st, there was thawing weather, and some rain. On the evening of January 21st, a Transport Company bus, not driven by plaintiff, became stuck with its front wheels in the hole. Witnesses estimated the depth of the hole at that time as between two and a half and three feet, filled with water and mud. Partial repairs were made by an employee of the city that night, but at the time of plaintiff's accident on the morning of January 22d, the depth of the hole was estimated at from 15 to 20 inches, and its width at three feet.

The record contains testimony by engineers that if the trench had been filled with acceptable materials and properly compacted according to specifications, the fill could not possibly have settled more than a few inches within the time which had elapsed. Thus, there is sufficient evidence to support the jury's finding that Wichman's employees were negligent in filling the trench.

The reason stated by the circuit court for directing a verdict in favor of Wichman was that because the fill sunk after the city approved of it, and plaintiff's injuries occurred before the city gave the contractor any notice of the sinking, Wichman could not, as a matter of law, be liable for the defect in the street. Wichman's liability to plaintiff would not be based, however, upon a failure to introduce further fill after the original fill commenced to settle, but upon the negligence of his employees in failing to fill the excavation properly in the first place. "It is no excuse that one who has created a peril did not intend or expect an injury to result therefrom; every person is held to a knowledge of the natural and probable consequences of his acts." 38 Am. Jur., Negligence, p. 667, sec. 24.

It follows that Wichman was not entitled to a directed verdict and that the complaint against him could properly be dismissed only if the verdict supported a judgment of dismissal.

■ *Causal negligence of plaintiff.* Plaintiff asserts that there is no credible evidence to support the jury's findings that he was causally negligent as to speed, lookout, and management and control, and that, in any event, there was duplicity as to the findings of negligence as to lookout and management and control. We disagree.

West Villard avenue ended at Eighty-Fourth street, and the area was apparently newly developed. There had been recent construction, and the street west of Seventy-Seventh street was described as being somewhat bumpy, very bad, and having quite a few holes. After the Transport Company bus became stuck in front of 8140 West Villard in the evening of January 21st, a city police officer was called, and another employee of the city made temporary repairs that night. He testified that he inserted some fill for a length of about 10 feet, and put lighted barricades on each end, showing that the ends were hazardous, and that traffic was allowable through the middle.

Shortly after 6 a. m. on January 22d, plaintiff commenced a bus run toward a destination at Eighty-Third and West Villard. Traveling on West Villard, he stopped at Eighty-First street to discharge his only passenger. He started up again, and had just reached a speed of 15 to 18 miles per hour, when he noticed a puddle of water all the way across the roadway. He testified that he could remember nothing more until he found himself on the floor of the bus after it had stopped; that he tried to "jump the brake" when he hit the hole, but thought he did not get there. The front wheels of the bus went into the hole, and there is testimony by another witness that the front of the bus rested on the pavement, although plaintiff could not remember whether the

front wheels had come out of the hole again before the bus stopped. He was able, with some difficulty, to get the bus on its way under its own power. It was about 225 feet from the bus stop at Eighty-First street to the mudhole. The accident occurred at about 6:45 a. m., and it was foggy and still dark.

Plaintiff regularly drove a bus over this same route. He had not been on duty, however, since January 17th. He testified that there had been a depression in front of 8140 West Villard when he drove on his last trip before the accident, but, "it wasn't bad enough to make me slow down below 15 miles an hour." He also said, "I went over it at between 10 to 15 miles an hour when the time allowed and when I had more time I took it easier." The driver of the bus which had become stuck the evening before testified that even prior to the thawing weather, "you had to slow down to go over this depression considerably." A lady who rode the buses each day testified that there had been a little depression there for about two weeks, and that the bus drivers were very, very careful in crossing it; that they crawled across at no more than two or three miles an hour. These witnesses were called by plaintiff.

It is clear from the facts just recited that there were many bumps and holes in the vicinity of the accident, and that plaintiff knew of the existence of a depression at the specific location for several weeks prior to the accident. Plaintiff testified that he saw a puddle extending across the roadway, but if the lighted barricades at each end of the depression were present as claimed by the city repairman, plaintiff does not appear to have seen them. Plaintiff does not claim to have applied the brake as soon as he saw the puddle, but indicated that when he did try to apply it, he was unsuccessful. The jury could properly find that his speed was too great under the circumstances; that he was negligent in not seeing the barricades, thus being warned that there was

greater danger than usual, and that in view of his previous knowledge of the existence of the depression, he was negligent in failing to apply the brakes effectively and promptly as soon as he saw the puddle. Findings of negligence both as to lookout and management and control are not necessarily duplicitous. One can fail to see danger as soon as he should have and fail to do what he ought to do after he has belatedly seen the danger.

■ *Comparison of negligence.* Plaintiff argues that the verdict must be set aside because the causal negligence found appears to total 150 per cent. Although we do not approve of the form in which the jury was asked to make its comparison of negligence in this verdict, we do not agree with plaintiff's conclusions as to the meaning of the answers made. The questions appear to have meant that the jury should allocate the combined causal negligence of the city and plaintiff between those two parties in answering question No. 8, and should allocate the combined causal negligence of Wichman and the plaintiff between those two parties in answering question No. 9. It appears from the answers that the jury so understood the questions. The allocation of 50 per cent to each party in each question would then mean that the causal negligence of each of the three parties was equal to the causal negligence of each of the others,—in other words, that each of the three parties was responsible for $33\frac{1}{3}$ per cent of the total of all the causal negligence. Plaintiff cannot then recover from either defendant because his contributory negligence was as great as the causal negligence of each. Sec. 331.045, Stats.; *Walker v. Kroger Grocery & Baking Co.* (1934), 214 Wis. 519, 536, 252 N. W. 721.

The circuit court, in preparing the form of the verdict, was evidently concerned over the legal question of whether Wichman could be liable to plaintiff in any event, and desired to have separate comparisons of negligence in the verdict so that if it were ultimately determined that Wichman was

not liable, as a matter of law, the answers to question No. 9 would be immaterial, and the answers to question No. 8 would be unaffected. Plaintiff failed to object to the method of submission selected by the court and is foreclosed from claiming at this stage that a different form of verdict would have been better. *Burmeister v. Damrow* (1956), 273 Wis. 568, 580, 79 N. W. (2d) 87.

■ *Claimed perversity.* Plaintiff claims that the verdict was perverse and must be set aside. He points out that the jury found that he sustained no damages for medical and hospital expense, although the evidence established such expenses in the amount of $597.16. The circuit court was of the opinion that this answer represented a misunderstanding by the jury of its duty as to the particular question, and that the jury followed instructions in all other respects. Some, if not all, the bills in evidence indicated that plaintiff's employer had either paid them or reimbursed plaintiff. Since the employer was not a plaintiff, the jury's failure to award the amount of these bills as medical and hospital expenses may well have reflected a misunderstanding in good faith, and not a refusal to heed the instructions of the court. While the evidence as to plaintiff's injuries would have sustained higher awards for loss of wages, impairment of earning capacity, and personal injuries, plaintiff has not based his claim of perversity upon the amount of these awards, and the evidence was clearly such as to present jury questions as to the seriousness of his injuries, and whether some of his complaints arose from the accident or from unrelated causes. The trial judge was satisfied that the verdict was not perverse, and the record does not supply any reason for us to find otherwise.

*By the Court.*—Judgment affirmed.