Burmeister, Appellant, vs. Damrow and another, Respondents.*

*October 8—November 7, 1956.*

* Motion for rehearing denied, with $25 costs, on January 7, 1957.

For the appellant there were briefs and oral argument by *George H. Murwin* and *Cleland P. Fisher,* both of Janesville.

For the respondents there was a brief by *Thronson, Roethe & Agnew* of Janesville, and oral argument by *John T. Roethe* and *Ernest P. Agnew.*

STEINLE, J. The facts established by undisputed evidence of record are as follows: The defendant, E. H. Damrow, is the father of the defendant, John E. Damrow. Both are chiropractors. The son was an employee of the father in a chiropractic clinic conducted at the residence of the father on Center avenue near the city of Janesville. In 1949 the father began the construction of a new office building upon property where his residence was located. The son had no financial interest in the property. Father and son did some work themselves on the new building. Contractors were engaged by the father to do work which the father and son were not skilled in performing. Neither the father nor the son was experienced in plastering. In September, 1950, the father engaged the plaintiff, Robert H. Burmeister, a plastering contractor of Janesville with forty years of experience, to plaster the exterior of the new building and also a ceiling in the interior thereof. The plaintiff, together with his own son, Darrell Burmeister, did the work. Robert Burmeister performed the actual plastering, while the son acted as helper and, among other duties, mixed plaster for his father in the mixing machine brought to the premises by them. Neither of the Damrows supervised or assisted in that work. At that time a discussion took place between the plaintiff and the defendant, E. H. Damrow, relating to other plastering work to be done in the interior of the building at a later date. In February, 1951, E. H. Damrow communicated with Robert Burmeister and requested him to undertake the unfinished plastering work in the inside of the building. Burmeister told the elder Damrow that his son, Darrell Burmeister, could not assist him since he had taken a position elsewhere. Damrow told Burmeister that either his own son, John Damrow, or he himself, would give assistance. Burmeister agreed to undertake the work on that basis.

On the morning of March 5, 1951, Burmeister went to the Damrow premises to ascertain the nature and extent of the

plastering work to be done in the interior of the premises. At that time an understanding was had between Burmeister and the Damrows that Burmeister's mixer was to be placed in the basement of the new building. However, nothing was said while E. H. Damrow was present as to the method or means by which the mixer was to be put in the basement, or as to the exact time when the mixer was to be brought upon the premises. On the afternoon of that day Burmeister brought his equipment, including the mixer, to the Damrow premises. The mixer was set on rubber-tired wheels and weighed about 500 to 600 pounds. It was attached (trailer-like) to Burmeister's platform truck. E. H. Damrow was taking care of patients in his residence when Burmeister arrived. John Damrow at the time was doing some work in the inside of the new building preparatory to commencement of the plasterwork. The premises outside the new building were in a muddy condition. John Damrow previously had driven the Damrow farm tractor to the front of the premises. When Burmeister drove into the driveway with his truck and mixer, John Damrow went outside and started the tractor in operation. The mixer was disengaged from the truck and hooked onto the tractor. John Damrow drove the tractor and pulled the mixer through the mud to a place near the rear entrance of the new building. The mixer was unhooked from the tractor and pulled onto a platform just inside the back door of the building. Two planks (each 2″ x 12″) were placed over the steps leadings to the basement. They were put down in such a position that one end of each plank was supported by the edge of the landing of the stairway, and the other end of each was held in place by a steel beam. The bottom of the planks, however, did not rest on the steps. The planks were to serve as a ramp by means of which the mixer was to be lowered to the basement. There were no walls on either side of the stairway and there were no railings there. The steps were 44″ in width. There is a

drop of 7′1″ from the landing at the top of the stairs to the basement floor. Along the edge of the steps from the landing to the basement floor the distance is 11′4″. Robert Burmeister and John Damrow each took a position on the steps in front of the mixer, Burmeister on one side and Damrow on the other. It was their intention to guide and steady the mixer as it moved on its wheels on the improvised ramp. The mixer was pulled over the top part of the planks which protruded over the landing. While being moved forward and downward the mixer went out of control. John Damrow fell to the basement floor, but was not injured. Burmeister landed on the floor at the bottom of the steps. His leg was severely injured, and as a result, was later amputated. No other method of placing the mixer in the basement had been discussed between John Damrow and Burmeister on the afternoon before the accident.

With reference to conflicting evidence of record, Robert Burmeister testified in substance that he loaned the mixer to the Damrows. He stated that in his conversation with the Damrows on the morning of the accident he had suggested that the mixer be placed on the main floor of the new building, but that E. H. Damrow was concerned that flooring might be damaged there, and preferred that it be placed in the basement. At that time the Damrows said that the mixer would be hard to move, and that they had a tractor and chain by which it could be moved easily and put into the basement. From the time the mixer was brought to the premises in the afternoon, John Damrow directed the handling of it. He unhooked the mixer from the truck, attached it to the tractor, and without advice from Burmeister moved it in the yard to a place near the building. Darrell Burmeister offered to help, but John Damrow said that he and Robert Burmeister could handle it alone. Burmeister had asked that E. H. Damrow help, but John said that his father was busy and that they themselves could lower the mixer to the basement. The

runway was made at the suggestion of John who brought in two planks which were muddy and wet, from outside the building, and handed them down the steps to Burmeister who stood on the basement floor. John suggested placement of a steel "I" beam against the lower end of the planks. John measured the distance between the wheels of the mixer and told Burmeister where to place the planks. Burmeister had never before placed the mixer in a basement. He took a position on the steps as directed by John. He was about six steps down from the landing when John disappeared. John gave no warning that he was not able to hold the mixer. Both of them had pulled the mixer over the top of the ramp. The mixer came down fast and Burmeister did not know what had happened.

E. H. Damrow testified that his son, John, had no financial interest in their new building although he spent considerable time assisting in the construction thereof. E. H. Damrow took no part in moving the mixer. He did nothing with respect to preparing the premises so that the mixer could be lowered to the basement. He did not tell Burmeister on the morning of March 5, 1951, that if Burmeister would bring the mixer, his son John would have a tractor and chain for use in pulling it around and moving it into the basement. Between the time of the morning meeting and the afternoon when Burmeister brought the mixer, he had not instructed his son John to help in placing the mixer in the basement.

John Damrow testified that although he spent considerable time in helping to plan and construct the new building, he had nothing to do with the supervision thereof. During the course of the conversation on the morning of March 5, 1951, E. H. Damrow asked Burmeister whether the mixing could not be done outside. Burmeister said that because of weather conditions he wanted the mixer in the basement. E. H. Damrow at the time stated that if Burmeister could not get a tender he or John would help Burmeister, assuming that

they would be told what to do. When Burmeister arrived with the mixer, John was placing wire lath on cracks in the interior of the building pursuant to suggestion of Burmeister that morning. Darrell Burmeister arrived at about the time his father pulled up with the truck and mixer. John did not tell Darrell that E. H. Damrow would assist. John had placed the tractor near the front of the property to assist in pulling the mixer through the mud should there be need. He had not previously advised Burmeister that he would have the tractor there for the purpose of pulling the mixer. Burmeister unhooked the mixer from the truck. It was attached to the tractor. John drove the tractor, but Burmeister told him where to stop. When the tractor was stopped, Burmeister said, "We will push it from here." The mixer was moved to the platform. It was Burmeister who suggested the use of the planks which were in the basement at the time, and requested John to pick them up. Burmeister directed the placement of the planks. He said that he did not want them to slide at the bottom, and he asked John to block the bottom of the planks, which John did with a seven-inch "I" beam obtained from the premises. Burmeister said "That will do the job fine." Burmeister indicated the procedure that was to be employed in moving the mixer on the planks. He showed John the positions that each of them was to assume on the steps, and demonstrated how they were to hold and move the mixer. The planks were springy. There were 11 steps. Burmeister was to take position on the north edge of the stairway, and John at the opposite edge. Each was to place one hand on the tongue of the mixer and the other hand on the barrel. They were to push down on the tongue, hold back at the barrel, and move backward down the steps. They took their respective places on the steps, and Burmeister directed that they pull the mixer from the platform over the edge of the planks, which was done. The weight of the mixer forced them both down the stairway. John thought that his

own foot had not slipped. He was pushed to the side of the stairway and fell to the floor. Burmeister was pushed in front of the machine, whether due to getting his foot stuck or what, and knocked over backward. John saw Burmeister tip backward near the foot of the stairs. The mixer came to rest at the foot of the stairs. John did not see any part of the mixer pass over Burmeister. The planks had not been disturbed. The tractor and chain remained in the place where the mixer had been when it was detached from the tractor.

Common-law negligence and violation of the safe-place statute were separately asserted in the complaint against each of the defendants. The trial court granted E. H. Damrow's motion for nonsuit as to both causes of action. A special verdict was submitted to the jury with respect to the cause of action against John Damrow involving violation of the safe-place statute. In part it inquired as follows:

"Question 1: Was the ramp for lowering the plaster mixer into the basement prepared at and under the direction of the defendant, John E. Damrow, and not at the direction of Robert H. Burmeister?

"Answer: ————.

"If you have answered question One by 'Yes' then answer this question:

"Question 2: Did the defendant, John E. Damrow, fail to have the ramp or runway so constructed as to be as safe and free from danger as the nature of the place would reasonably permit?

"Answer: ————.

"If you have answered question Two by 'Yes' then answer this question:

"Question 3: Was such unsafe construction of the ramp as you have found a cause of the accident?

"Answer: ————.

"If you have answered question Three by 'Yes' then answer this question:

"Question 4: At the time of or just before the accident did the plaintiff, Robert H. Burmeister, fail to exercise ordinary care for his own safety?

"Answer: ———.

"If you have answered question Four by 'Yes,' then answer this question:

"Question 5: Was such failure to exercise ordinary care as you have found a cause of the accident?

"Answer: ———.''

Other questions of the verdict related to comparison of negligence, and damages. The answer of ten jurors (five sixths of the jury) to question No. 1 was "No." No questions of the verdict excepting only question No. 1 and those relating to damages, were answered by the jury. After verdict the plaintiff moved for a change of the answer to question No. 1, and upon such change, for judgment in his favor, or in the alternative for a new trial on various bases. The defendant, John Damrow, moved for judgment on the verdict. The court granted the motion of said defendant, and ordered judgment dismissing the complaint upon its merits against both defendants.

With reference to the causes of action in the complaint charging common-law negligence, an observation of the trial court in its memorandum decision is pertinent. The court said:

"It is not clear from the testimony precisely how the accident happened. In some way, while the mixer was being lowered or about to be lowered by means of this ramp, and after the front wheels of the mixer were on the ramp, it went out of control. It rolled down into the basement impelled, apparently, by its own weight. If there is anything which either Damrow or Burmeister did or failed to do in the actual immediate manipulation or management of the plaster mixer at the moment it went out of control, the evidence fails to show what it was."

Clearly the evidence was insufficient to establish common-law negligence against either of the defendants, and, upon the record, a finding of such negligence in favor of the plaintiff could rest only on guess or conjecture. The court prop-

erly dismissed the complaint against both defendants with respect to asserted common-law negligence liability.

The plaintiff maintains that the trial court erred in various particulars with reference to its disposition of the plaintiff's alleged causes of action against the defendants with respect to violation of the safe-place statute. Plaintiff contends that since John Damrow was working for his father, knowledge to him of the unsafe situation was knowledge to the father. It is also claimed that the evidence indicates that the father and son were joint adventurers. Further, plaintiff urges, that since the father knew that the mixing machine was to be placed in the basement and since he made no arrangements to have the premises adequately prepared so that the machine could be lowered in safety, there was liability upon him. The particular items in regard to which it is claimed the defendants defaulted, consist in not furnishing a ramp conformable with industrial commission regulations; in failing to have a railing on the stairs; in failing to furnish safeguards or safety devices, particularly in not arranging for the use of the tractor and the chain.

It is to be noted that in its treatment of this matter at the trial, the court ruled that the premises constituted a "place of employment" and considered the plaintiff as a "frequenter" in manner as those terms are defined in sec. 101.01 (1), (5), Stats., and referred to in secs. 101.06 and 101.07. In exonerating the defendant, E. H. Damrow, from violation of the safe-place statute, the court declared that while said defendant owed a duty to the plaintiff to furnish to him, as a frequenter, a reasonably safe place to work, the evidence indicates that the premises were reasonably safe when the plaintiff arrived and proceeded to set up the mixer to perform his work. The court also noted that the evidence undisputedly established that E. H. Damrow knew nothing about the particular operation by which it was proposed to install the mixing machine in the basement of the premises. The court was of a

mind that the safe-place statute has reference to and seeks to regulate an unsafe condition of the premises, but that it has no application to an operation or to an act which is in the process of taking place, and that the moving of the mixer was such an operation.

From the nature of the questions submitted to the jury, it is apparent that the court was of a view that John Damrow could only have been liable for violation of the safe-place statute in the event that it was determined that he and not the plaintiff directed the preparation of the ramp, and further, that such liability could have existed only had it been found that John Damrow had provided an unsafe ramp which caused plaintiff's injury. Manifestly, had it been found that John Damrow directed the preparation of the ramp, the inference would have been that he, and not the plaintiff, was in control of the property. On the basis of the jury's answer to question No. 1, the court found that the plaintiff's damages resulted entirely from a choice that he had made concerning the preparation of the ramp and the operation of moving the machine, concerning which the defendants were not at fault.

Regarding the contention of the plaintiff that the absence of a handrail on the stairway was a violation of the safe-place statute which contributed to the injury, the court said: "What effect a handrail would have had upon the progress of the plaster mixer as it proceeded down the ramp would be pure speculation. It appears that Damrow, at least, was able to escape injury due, perhaps, to the absence of a handrail."

With reference to the plaintiff's position that there was a violation of the safe-place statute in the failure to have furnished additional devices or safeguards, the court declared: "Just what devices or safeguards he [E. H. Damrow] could have furnished which would have prevented the operation, the details of which were unknown to him, is not clear. There was a tractor and chain upon the premises the use of which it is claimed, might have prevented the accident; al-

though it is not shown just how they could have been used to prevent the accident."

Error is assigned by the plaintiff with respect to the form of question No. 1 of the special verdict. It is contended that said question is compound—duplicitous—and that actually two or three questions are incorporated in it. It is argued that the question is fatally defective for uncertainty. With reference to such contention the trial court said:

"The plaintiff criticizes the verdict as being duplicitous, although he made no such objection when the question was submitted. In view of the testimony of the parties the jury could not possibly have been confused. The only question it had to decide was: 'Do you believe the defendant or do you believe the plaintiff?' Or put another way: 'Who had the direction and control of the project?' This is only one question, and the verdict cannot be said to be duplicitous in form. It was the court's purpose to frame the question in such a way so that the jury would not lose sight of the contention of either party, and at the same time to place the burden of an affirmative answer upon the plaintiff. The plaintiff has not suggested a better method of accomplishing this purpose."

The purpose of the submission of question No. 1 to the jury was expressed by the court in its memorandum decision, as follows:

"Instead of deciding the case as a matter of law, the court decided to submit the disputed issue of fact to the jury, reserving its decision as to the effect of the verdict upon the result of the trial.

"As the record stands, there were two separate and conflicting versions of the occurrence for the jury's consideration. According to one version the ramp was installed at the direction of the plaintiff. According to the other version, the plaintiff had completely surrendered to John E. Damrow the duties he had assumed when he contracted with E. H. Damrow to plaster the walls; and John E. Damrow on his part had—according to Burmeister—assumed full control of the project. There was no evidence of any other arrangement.

There was no evidence to sustain a finding, for instance, that this was a joint project.

"The burden was upon the plaintiff to convince the jury that not Burmeister but Damrow directed the preparation of the ramp. Accordingly, the question was submitted."

We are of the opinion that the submission of question No. 1 of the verdict was proper both with respect to its subject matter and its form. It cannot be held that the question was duplicitous in that it embraced more than one inquiry. The only matter asked about was whether John Damrow had directed the preparation of the ramp. It does not appear that the jury was misled by the inquiry in the question. The plaintiff did not object to the form of the question. Where a special verdict is objectionable in form, counsel must object to the refusal of the court to correct it. *John Hoffmann & Sons Co. v. Parks* (1921), 175 Wis. 303, 184 N. W. 1035.

In view of the jury's answer, it must be considered that the plaintiff directed the preparation of the ramp for use in lowering the mixer to the basement, and that he controlled the project. The only possible inference resulting from such answer is that John Damrow merely assisted the plaintiff in manner as he and E. H. Damrow had claimed in their testimony, and that John Damrow did not control or supervise the temporary structure that was set up. The evidence establishes that John Damrow was not a joint adventurer with E. H. Damrow in the construction of the building. He was not a partner, nor was he intrusted with supervising authority. Knowledge to him of the fitting up of the ramp as directed by the plaintiff, was not imputable to E. H. Damrow. It was E. H. Damrow who exercised control and supervision of the premises, and it does not appear that E. H. Damrow did not furnish a safe place to the plaintiff in his capacity of independent contractor when he came upon the premises on the day in question.

The control of the premises was given by E. H. Damrow to the plaintiff for the performance of the plastering work

and for items incidental thereto, including provision for preparation. Setting up facility for the mixing of the plaster is clearly such an incidental matter. E. H. Damrow possessed no knowledge or skill with respect to moving a plaster mixer, preparing plaster, or performing plaster work. He in nowise supervised or controlled the activities of the plaintiff in the preparation or performance of the plaster work. The plaintiff directed the operation of moving the machine into the basement. It was he who caused the change in the premises which resulted in his injury.

The situation is ruled by principles enunciated in *Neitzke v. Kraft-Phenix Dairies, Inc.* (1934), 214 Wis. 441, 253 N. W. 579, and *Potter v. Kenosha* (1955), 268 Wis. 361, 68 N. W. (2d) 4. In the *Neitzke Case* it was said (p. 447):

"Situations may arise where the premises are so changed by the independent contractor as to excuse the owner from liability. If, for instance, the dangerous instrumentality is erected by the independent contractor himself, or a defective scaffolding is installed, the owner may not be liable for the injuries resulting."

In the *Potter Case* this court stated (p. 372):

"We are constrained to hold that when an owner turns over to an independent contractor the complete control and custody of a safe place, whereon or whereunder the contractor creates a place of employment for the purpose of fulfilling the terms of the contract, the owner reserving no right of supervision or control of the work excepting that of inspection or to change the plan with reference to the construction to be furnished, if thereafter in the performance of the work under the contract the premises are changed by the contractor and as a result a hazardous condition is created, the owner does not become liable to the contractor's employee injured as a consequence of such hazardous condition while acting in the scope of his employment. Were we to hold otherwise we would be placing an interpretation upon the statute not intended by the legislature. Here, the city's purpose in letting the contract was to obtain a satisfactory sewer. By its contract the city merely designated the place where the sewer

was to be located and fixed the standard of quality and quantity of construction that it desired. Everything in connection with the actual work entailed in providing such a sewer was left to, and undertaken by, the contractor. It is obvious that a sewer could not be furnished without the excavation of a trench. However, the city had not contracted for a trench; it contracted for a sewer. We perceive of no distinction of plan had the city contracted for an improvement or repair to the ceiling or wall of one of its buildings, where, in order to gain access to the place to be improved or repaired, a scaffolding would be required."

The placement of the ramp in the instant case is comparable to the erection of a scaffold or the digging of a trench as respectively referred to in the *Neitzke* and *Potter Cases*. Under authority of those cases there can be no liability on the part of the owner or custodian of premises to an employee of a contractor, when such contractor to whom control of the premises has been given, brings about a change in the premises, and the employee is injured as a result thereof. Since an employee of such contractor would not be entitled to recover against the owner, it is plain that the contractor cannot recover for injuries to him arising from his own negligent activity. Here the dangerous condition resulted entirely from the change of the premises wrought by the plaintiff during the time when he was in control for the performance of the work for which he was engaged. The defendants are not liable to him under the provisions of the safe-place statute for the injury that he sustained. In view of this conclusion we deem it unnecessary to discuss the contentions of the plaintiff regarding claimed violation of the statute, or matters relating thereto, concerning the absence of a handrail and the failure to provide safeguards or devices, except to note that the evidence does not establish that the absence of a handrail was a cause of the injury, or that it was the duty of the defendants, or either of them, to have furnished a tractor and chain for the lowering of the mixer into the basement.

Had the circumstances been as claimed by the plaintiff, it still would have been incumbent upon the court in the light of the evidence to hold as a matter of law that the plaintiff was guilty of contributory negligence which was equal if not greater than any negligence of the Damrows. As said in *Frei v. Frei* (1953), 263 Wis. 430, 434, 57 N. W. (2d) 731:

"He also knew there was a perfectly safe way of protecting himself . . . —and he knew that he was entitled to use this method. Knowing all these facts, he chose the dangerous way and was, under the circumstances, guilty of contributory negligence.

". . . If such conduct constituted contributory negligence, it was the duty of the trial court to hold such negligence of the plaintiff, as a matter of law, to have been at least as great, or greater, than defendant's negligence."

In the case at bar the choice of method and means of moving the mixer into the basement rested entirely with the plaintiff.

We are obliged to determine that the judgment which directed dismissal of the complaint as to both defendants with respect to all causes of action, must be sustained.

*By the Court.*—Judgment affirmed.