WEBER, Appellant, v. CITY OF HURLEY, Respondent.

*April 6—May 2, 1961.*

For the appellant there was a brief and oral argument by *Alex J. Raineri* of Hurley.

For the respondent there was a brief by *Schmitt, Wurster & Tinglum* of Merrill, and *James E. Flandrena* of Hurley, and oral argument by *Leonard F. Schmitt.*

MARTIN, C. J.   In the course of building a home on leased land near the intersection of Copper and First streets in the city of Hurley, plaintiff applied to the city for permission to make connection to the sewerage main in said intersection. With the city's knowledge plaintiff hired one Matt Johnson, who made the basement excavation for the home, to dig a trench from the sewer main to the home. The city reserved the right to break the paved surface of the street

and to determine the location, depth, and direction of the digging.

Johnson first dug a square hole, about five feet by five feet, approximately six and one-half feet deep, at the place in the street where the city employees had determined the location of the sewer main to be. Then he proceeded to dig a trench from the hole toward the plaintiff's house. He was instructed by the city as to the depth and direction of the trench. He intended to go straight through the curb but the street superintendent would not permit it and he went around it. The sides of the trench were left vertical and no shoring was installed. City employees entered the hole, made a connection at the sewer main and laid one or two lengths of pipe. It was understood that the plaintiff would lay the remainder of the tile and the city employees instructed him as to the grade he should maintain for proper drainage. Shortly after the city employees left the scene plaintiff entered the trench, laid a few tiles and then a portion of the trench wall collapsed, injuring him.

Under sec. 270.635, the summary-judgment statute, judgment may be entered in favor of the plaintiff if his affidavits set forth "evidentiary facts" establishing his cause of action sufficiently to entitle him to judgment, or, if the motion is by the defendant, his affidavits set forth such "evidentiary facts" as shall show that his denials or defenses are sufficient to defeat the plaintiff. While the summary-judgment procedure is considered drastic and is not to be employed as a trial on affidavits, its purpose is to enable the court to make final disposition of matters which involve no issue of fact. *Marco v. Whiting* (1944), 244 Wis. 621, 12 N. W. (2d) 926.

The rule is well established that:

". . . upon a motion for summary judgment the evidentiary facts set forth in an affidavit completely supplant any allegations or denials in the pleadings to the contrary.

*Laughnan v. Griffiths* (1955), 271 Wis. 247, 251, 73 N. W. (2d) 587." *Home Savings Bank v. Bentley* (1958), 5 Wis. (2d) 19, 23, 92 N. W. (2d) 377.

It is alleged in the complaint:

"5. Plaintiff further complaining alleges that on the 15th day of July, 1958, he went to the defendant city requesting sewer connection for his home in the city of Hurley; and the defendant agreeing supervised the digging of a trench on its property known as Copper street in the said city over to its sewer main located near the center of said street; that when said trench was dug out to its main, city crews under proper supervision made a tap onto the main sewer; that there-after the plaintiff was invited to enter the defendant's trench on its property for the purpose of laying additional lengths of sewer pipe from the tap onto the main sewer; that the plaintiff entered said trench and was making pipe connections under the instruction of proper city authorities when a por-tion of the curbing in said street caved in upon him causing injuries as hereinafter alleged."

Answering the complaint, the city denied that it performed or supervised the digging of the trench as alleged; denied that it invited plaintiff to enter the trench; specifically alleged that the trench was dug by plaintiff through his contractor; alleged that plaintiff entered the trench of his own free will and denied that plaintiff made any pipe connections under the instruction of the city or its agents.

Plaintiff's affidavit states, in part:

"It was further agreed between Mr. Lerza [city street commissioner] and Mr. Johnson and Mr. Weber that the city would have control of all digging operations on the city street, including the manner of digging, place of digging, depth, and all other phases of setting up the trench on city property."

In the affidavit of Fred Lerza it is stated:

"3. That plaintiff expressed an interest in having a trench to accommodate such sewer connection dug by the city; that one Matt Johnson, who was then employed by plaintiff to

excavate for plaintiff's basement, offered, in the presence of affiant and plaintiff, to do for plaintiff all the digging necessary, on city and private property, to accomplish the connection, and also to fill all excavations after the connection was completed, for the sum of $25—which offer was then and there accepted by plaintiff;

"4. That the city of Hurley, through its agents and officials, did at all times reserve the right to—

"(a) Determine the location and time of digging in its street;

"(b) Have the actual tap onto the city's sewer main made by city employees and no others, for which service the customary charge of $75 was to be made; . . .

"7. That your affiant and the other city employees determined the location of the city sewer main and broke the asphalt surface of the street in the area above the main to avoid unnecessary damage to the street surface;

"8. That your affiant then instructed plaintiff or plaintiff's subcontractor Johnson as to where and how deep to dig with Johnson's power shovel to reach the main;

"9. That Matt Johnson, unaided by any of defendant's agents or employees thereupon dug or excavated a hole or trench in the city street, the dimensions of which were approximately six and one-half feet in depth and between five and eight feet on the sides;

"10. That at no time did plaintiff or Matt Johnson ask or receive of defendant's agents and employees instructions or advice with respect to the manner in which the digging was to be done;

"11. That when said hole was complete, plaintiff's subcontractor stopped digging and two city employees entered said hole or trench and used hand tools to uncover and tap onto said sewer main and lay one or two lengths of sewer pipe;

"12. That thereupon your affiant and all other city agents and employees left the trench and the premises, taking with them all tools except a level, which plaintiff asked and was given permission to borrow; and plaintiff's subcontractor Johnson began digging a trench from the original hole or trench toward plaintiff's home;

"13. That plaintiff entered said hole or trench immediately thereafter and began to lay his own sewer pipe along the bottom of the trench dug by Matt Johnson;

"14. That sometime thereafter, the mishap occurred of which plaintiff complains, and that at such time neither your affiant nor any of his crew was present at the scene;

"15. That at no time was plaintiff or Matt Johnson in the employ of defendant city."

In another affidavit filed on behalf of the defendant, excerpts from the transcript of the adverse examination of plaintiff are set forth. Plaintiff testified that at the time he, Lerza, and Johnson agreed on Johnson's doing the digging, the following discussion took place:

"Well, I told Lerza about it, and he said it was going to cost lots of money if 'we do the digging,' and so Matt spoke up and he said he would do it for $25 and he had his rigging right there handy to do the digging, Lerza says he can't touch it so the fellow took his machine home and he came back the following Saturday to do the digging and they were just ready to do the digging when Mrs. Savant comes running out of her house and she said 'Walt, are you going to dig here today?' I said 'Yes,' I think that was at 1 o'clock in the afternoon, something like that, and she said 'my daughter is getting married and you are going to tear up everything,' well, so rather than having any arguing with a neighbor, or hard feelings, I sent him home and I said 'you come back when you can,' so then he came back on whatever day—that was the 15th he came back there; he got there at 1 o'clock and Lerza says—I went down to see Lerza, and Lerza said 'you can't touch that sewer until I get there and I will tell you right where to dig and I want to be there when you break that open.' "

As to the hiring of Johnson, plaintiff further testified that Lerza said, " 'If you can get him to dig for $25 you had better get him, it will run more for us.' " On being asked what his exact agreement was with Johnson as to the way the trench was to be dug, plaintiff testified:

"I didn't have any agreement with him at all, he just went and dug, I don't know nothing about trenches or anything like that."

Plaintiff further testified that when Lerza and his crew arrived at the scene on the day the digging was done:

"Well, Matt—he told him which way to go with the sewer, the angle to go.

"*Q*. He told who, what? *A*. Lerza told Matt Johnson which way to go with the sewer.

"*Q*. He told him which way to go, which direction? *A*. That's right.

"*Q*. And did Lerza tell Johnson where to dig? *A*. That's right. In the street, then he says 'go right alongside that curbing,' then he says 'go at an angle towards the house.' . . .

"*Q*. And did Lerza tell Matt Johnson how deep to dig with his shovel? *A*. Yes.

"*Q*. How deep did he tell him to dig? *A*. He had to go about eight feet, I think, if I ain't mistaken. . . .

"*Q*. Did he tell him what dimensions of the trench or hole to dig in the street? *A*. He made a bigger hole in the street so that they could get down to connect on. . . .

"*Q*. How many feet long would you say that hole was? *A*. I would say four–five feet, you know, big there.

"*Q*. Four or five feet long? *A*. Wide. He dug it kind of big there where they started, see?

"*Q*. Would you say it was four or five feet from north to south? *A*. Yes, four–five feet. . . .

"*Q*. And while the city crew was in there Matt Johnson continued to dig the trench up toward the house? *A*. Yes.

"*Q*. Were the sides of this hole cut by Matt Johnson straight? That is, were they vertical? *A*. Yes, sir. . . .

"*Q*. There was no shoring in the hole whatsoever? *A*. No.

"*Q*. The sides were not sloped? *A*. No.

"*Q*. The trench Matt Johnson was digging back up toward the house in a southerly direction, were the sides of that trench vertical or were they sloped? *A*. Straight up and down.

"*Q.* Was there any shoring in that trench? *A.* No, sir.

. . .

"*Q.* Did Mr. Lerza at any time give you any instructions as to how the trench should be dug with respect to safety precautions? *A.* No, sir.

"*Q.* Did you at any time give Matt Johnson any instructions with respect to safety precautions? *A.* No, sir."

The statement made by plaintiff in his affidavit that, "It was further agreed between Mr. Lerza and Mr. Johnson and Mr. Weber that the city would have control of all digging operations on the city street, including the manner of digging, place of digging, depth, and all other phases of setting up the trench on city property" is nothing more than a conclusion. As stated in *Fuller v. General Accident Fire & Life Assur. Corp.* (1937), 224 Wis. 603, 610, 272 N. W. 839:

"The statute clearly requires an affidavit setting forth 'evidentiary facts.' 'Evidentiary facts' are not the same as 'ultimate facts,' which ordinarily are, or should be, alleged in pleadings."

See also *Schau v. Morgan* (1942), 241 Wis. 334, 6 N. W. (2d) 212.

Sec. 270.635, Stats., requires the statement of evidentiary facts. The statute would be meaningless if conclusions of law or statements of ultimate fact were held to raise issues for a jury. Clearly, plaintiff's statement that the city reserved control of all the digging operations does not controvert the evidentiary facts set forth in defendant's affidavits that the contract for the digging was between Johnson and the plaintiff and that Johnson's instructions from the city employees were only as to the location, depth, and direction of the excavations in the street. The only work done by the city was the breaking of the paved surface and the connection to the sewer main. After the tap was made the city employees left the scene; they gave neither Johnson nor plaintiff any

instructions as to how the digging should be done; nothing was said with respect to safety precautions. The city's instructions had nothing to do with the manner in which Johnson made the excavation, the walls being left vertical and without shoring.

It is stated in 18 McQuillin, Mun. Corp. (3d ed.), p. 343, sec. 53.75:

"An independent contractor is one who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work in accordance with his own ideas or under plans furnished by the person for whom the work is done, to produce certain results required by such person. The mere reservation by the city of the privilege of inspecting and generally supervising the work, and making changes in the plans, does not destroy or impair the character of independent contractor. Whether one is an employee or an independent contractor generally should be determined from the facts of the particular case, and from a proper construction of the contract as a whole."

In *Strohmaier v. Wisconsin Gas & Electric Co.* (1934), 214 Wis. 564, 253 N. W. 798, a contractor was engaged by a village to dig a trench and lay water pipes. Under the contract the progress and management of the work remained at all times within the direct control of the contractor, although the village might direct the method of making joints and lowering pipes. In doing the digging a gas-service pipe was severed, causing an explosion in an adjacent building. This court held the village was not liable, the contractor having retained control of the workmen and the operations employed in carrying out the method designated by the village.

In *Smith v. Milwaukee Builders' & Traders' Exchange* (1895), 91 Wis. 360, 64 N. W. 1041, certain contractors were engaged to erect a building according to fixed plans

and specifications under a contract which also provided that the work be performed under the inspection and to the satisfaction of the architects, the owner's agents. The plaintiff, while passing along the sidewalk next to the partially completed building, was injured when a brick fell from the fourth floor. It was held that the reservation of the right of inspection was not a reservation of power to control the manner in which the work was to be done; that the architects' control was for the sole purpose of requiring that the building be such as the contract demanded, and that the owner was not liable.

Under the uncontroverted facts in this case, Johnson was an independent contractor employed by plaintiff. He was in immediate and complete control of the street at the time he was digging the trench and when the accident occurred. None of the restrictions placed by the city upon his operations in any way affected the manner in which the digging was done. Plaintiff made the oral argument that the city may be liable in instructing Johnson to dig around the curb rather than through it. We cannot agree. The place of digging had nothing to do with Johnson's manner of doing the work or the opportunity to shore the walls.

The question before us is governed by a line of cases holding that when an owner turns over premises in safe condition to an independent contractor, he is not liable under the safe-place statute, sec. 101.06 and related sections, for damages produced by changes in the premises thereafter made by the contractor, even though the owner retains the right of inspection. In *Potter v. Kenosha* (1955), 268 Wis. 361, 372, 68 N. W. (2d) 4, the city contracted with one Tirabassi to install a sanitary sewer in a street. The contractor caused a trench to be excavated; Potter and another of his employees entered it to do some manual digging and lay tile. No shoring had been constructed and one of the walls fell, fatally injuring Potter. This court held the city was not liable under the statute, saying:

". . . when an owner turns over to an independent contractor the complete control and custody of a safe place, whereon or whereunder the contractor creates a place of employment for the purpose of fulfilling the terms of the contract, the owner reserving no right of supervision or control of the work excepting that of inspection or to change the plan with reference to the construction to be furnished, if thereafter in the performance of the work under the contract the premises are changed by the contractor and as a result a hazardous condition is created, the owner does not become liable to the contractor's employee injured as a consequence of such hazardous condition while acting in the scope of his employment."

See also *Neitzke v. Kraft-Phenix Dairies* (1934), 214 Wis. 441, 253 N. W. 579; *Burmeister v. Damrow* (1956), 273 Wis. 568, 79 N. W. (2d) 87.

*By the Court.*—Judgment affirmed.