CALDWELL, Plaintiff and Respondent, v. PIGGLY WIGGLY MADISON COMPANY, Defendant and Appellant: OWENS, d/b/a PORTAGE GLASS COMPANY, Impleaded Defendant and Respondent.

*October 6—November 1, 1966.*

448

For the appellant there was a brief by *William F. Nelson* and *Stafford, Rosenbaum, Rieser & Hansen,* all of Madison, and oral argument by *Mr. Nelson.*

For the respondent Caldwell there was a brief by *Bennett & Bennett* of Portage, and oral argument by *David H. Bennett.*

For the respondent Owens there was a brief by *Bogue & Sanderson* of Portage, and oral argument by *David Bogue.*

HEFFERNAN, J. Piggly Wiggly pursued all of its objections by appropriate motions for nonsuit, mistrial, directed verdict, and for judgment notwithstanding the verdict, and the issues raised by those motions are before this court.

*Was entryway under control of Piggly Wiggly as well as under control of Owens?*

The initial argument of Piggly Wiggly is that it cannot be negligent under the safe-place statute because the entryway was not under its control at the time of the accident and, hence, negligence, if there were any, must be attributed to Owens, to whom control had been surrendered. The jury in its special verdict determined that, at the time and the place of the accident, Piggly Wiggly had not turned exclusive control over to Owens. The only question for the determination of this court is whether there is any credible evidence that under a reasonable view supports the verdict. The resolution of the question of control is important in this case, for we have held that ownership *per se* of the premises is not determinative of the liability for an unsafe condition. We have said:

"Legal liability under sub. (13), sec. 101.01, Stats., is not predicated alone on absolute ownership of a place of employment. Where a right to present possession, control, or dominion of such place exists, the holder of such right may be held liable, *Freimann v. Cumming* (1924), 185 Wis. 88, 200 N. W. 662." *Potter v. Kenosha* (1955), 268 Wis. 361, 371, 68 N. W. (2d) 4.

See also *Werner v. Gimbel Brothers* (1959), 8 Wis. (2d) 491, 493, 493b, 99 N. W. (2d) 708, 100 N. W. (2d) 920; *Schwenn v. Loraine Hotel Co.* (1961), 14 Wis. (2d) 601, 607, 111 N. W. (2d) 495. This court said in *Potter, supra,* page 372:

"We are constrained to hold that when an owner turns over to an independent contractor the *complete control* and custody of a safe place, whereon or whereunder the contractor creates a place of employment for the purpose of fulfilling the terms of the contract, the owner reserving no right of supervision or control of the work excepting that of inspection or to change the plan with reference to the construction to be furnished, if thereafter in the performance of the work under the contract the premises are changed by the contractor and as a result a hazardous condition is created, the owner does not become liable to the contractor's employee injured as a consequence of such hazardous condition while acting in the scope of his employment." (Emphasis supplied.)

See also *Burmeister v. Damrow* (1956), 273 Wis. 568, 582, 79 N. W. (2d) 87; *Weber v. Hurley* (1961), 13 Wis. (2d) 560, 569, 109 N. W. (2d) 65.

We conclude that there is evidence to support the jury's verdict in this regard. Arnold, the manager of Piggly Wiggly, in answer to a question, stated that he said nothing about giving control or custody of any part of the store to Owens. There was testimony also that when Owens wanted the electricity that operates the foot-treadle door opener turned off, he asked Arnold to disconnect the plug, though the plug was "just inside" the door. Arnold stated that he continued to be in charge of all the store, including the front entrance where customers were coming in and out during the whole time in question. When the electricity was disconnected, Owens was directed by Arnold to block the other two doors in an open position so customers could get in and out. It is clear that Arnold, as manager of Piggly Wiggly, was in control of that portion of the store and he, in fact,

exercised control during the period relevant in this case. There is credible evidence to support the jury's verdict in this respect.

*Is there credible evidence to support the jury verdict that Piggly Wiggly had constructive notice of the danger to frequenters such as Marguerite Caldwell?*

No question is raised in regard to the fact that Owens exercised some considerable control over the immediate area where he was working on the door. There is similarly no dispute in regard to Owens' notice of the danger. Owens left the job knowing the exact condition of the premises. He, therefore, is charged with actual notice of the unsafe condition. Piggly Wiggly, however, argues that, even assuming that it was in control of the premises, it nevertheless incurs no liability unless it had notice, constructive or actual, that an unsafe condition existed. The trial judge instructed the jury that Piggly Wiggly did not have actual notice of the hazard. The appellant urges that there was no constructive notice either.

We have previously said in referring to the duties imposed by the safe-place statute:

". . . that the statute does not make an owner or employee the insurer of the safety of the frequenter and his duty to repair or maintain does not arise until he has at least constructive notice of the defect. To have notice of a defect, of course the defect must exist and, in order to impose liability, it must exist for so long a time that the party charged with responsibility by the safe-place statute has opportunity not only to discover it but to remedy the situation and avoid the accident." *Boutin v. Cardinal Theatre Co.* (1954), 267 Wis. 199, 204, 64 N. W. (2d) 848.

We have defined constructive notice as follows:

"Constructive notice of course is neither notice nor knowledge, but a mere shorthand expression. We say

a person has constructive notice of something when for promotion of sound policy or purpose he is to be treated as if he had actual notice, whether or not he had it in fact. *Schoedel v. State Bank of Newburg*, 245 Wis. 74, 76, 13 N. W. (2d) 534." *Uhrman v. Cutler-Hammer, Inc.* (1957), 2 Wis. (2d) 71, 75, 85 N. W. (2d) 772.

In *Turk v. H. C. Prange Co.* (1963), 18 Wis. (2d) 547, 561, 119 N. W. (2d) 365, we determined that the following instruction offered by the trial court correctly embodied the recognized principles of law:

" 'If you find from the evidence that an unsafe condition existed for such a length of time that the defendant . . . by the use of ordinary care, could have become aware of its existence and remedied the situation prior to the time the plaintiff sustained her injury, then the defendant . . . is charged with such knowledge.' "

A similar instruction was properly used in this case.

The unsafe condition with which we are concerned was the hazard created by the open, unmarked, unguarded doorframe (with its aluminum push bar lowered to ankle level), which was one of three doors to an outside entrance and exit of a busy supermarket. We are not persuaded that the hazard with which we are concerned was that of the cracked, allegedly bulged-out glass door that might have fallen upon a frequenter. Whatever hazard that constituted was remedied when the broken glass was removed. Potentially, then, a new hazard was created by Owens' removal of the glass and that hazard came into existence when the open doorframe was left unguarded. Is there credible evidence to support the jury's verdict that Piggly Wiggly had constructive notice of this new hazard?

The time during which Piggly Wiggly could be charged with constructive notice is admittedly short. The critical period—the time from which Owens left the premises to recut the glass to the time Marguerite Caldwell was injured—is, at the maximum, one-half hour and, on the basis of the weight of the evidence adduced at the

trial, is somewhat less. The evidence is fairly clear that Owens arrived on the job at approximately 7 o'clock. (Arnold testified that Owens arrived to commence the repair work at 7:30 to 8 o'clock, but his testimony in this respect is completely uncorroborated by any other evidence.) Arnold's testimony was that he had been talking to Owens while Owens was removing the damaged glass, and that Caldwell had fallen about five minutes later. He later so qualified his statement, that his time estimate could have been disregarded by the jury as having little probative value.

Lapp, Owens' assistant, stated that he and Owens arrived at about 7 o'clock, that they spent about fifteen minutes in removing the old glass and ascertaining that the piece they had brought with them was too long. During this period, Arnold talked to Owens, disconnected the electricity, and directed Owens to block the other two doors in an open position. Lapp testified they left the store and that about five minutes was spent going each way to the shop, and about five minutes was spent re-cutting the glass, exclusive of loading and unloading. Both Owens and Lapp testified that they were gone from fifteen to twenty minutes. Caldwell testified that she walked through the unguarded door at approximately 7:30. It is, therefore, clear, despite Arnold's statement that only five minutes elapsed from the time he talked to Owens to the time of the accident, that there was evidence upon which the jury could have believed that the door, with its glass removed, was left unguarded in a closed position for at least fifteen minutes.

Arnold testified that this was a busy evening, that customers were proceeding in and out of the store at this time of night. Arnold testified that on this night it was his duty and that of another employee to bag the grocery orders and to take them out through the entry-way to the car-parking area. There was also evidence

adduced in the examination of Arnold by Mr. Bennett, attorney for the plaintiff, from which the jury could conclude that, during the entire period of Owens' absence, Arnold was bagging groceries at a position from which he could have seen the entryway if he had looked in that direction. Arnold testified that he would have a clear view of the front entrance from the position at the check-out counter. However, he could not testify, with any certainty, what his position was. The appellant in its brief claims that the physical layout precluded a view of the entrance where the fall took place. However, the jury viewed the premises and was in a position to properly interpret Arnold's testimony in view of the physical facts. They could have concluded that the hazard was in plain view even if Arnold in fact had not seen it.[1]

Considering the knowledge that Arnold had that the glass had been removed from the door, the fact that the jury could have determined that the hazardous door was unguarded for at least fifteen minutes, that there was evidence that the normal traffic of the store might well have brought the manager or one of the other employees through the entrance and out to the parking lot during that fifteen-minute period, that there was evidence that the manager was in close propinquity to a position from which he actually could have seen the door, it is apparent that there is credible evidence to support the jury's verdict that Piggly Wiggly did have constructive notice of the hazard.

[1] We stated in *Rudzinski v. Warner Theatres* (1962), 16 Wis. (2d) 241, 249, 114 N. W. (2d) 466, in regard to a wet spot on the floor within six feet of where the usher was sitting:

"Under this evidence it would be immaterial how long the wet spots had existed on the floor. This is because they were in plain view of this usher and the jury would be warranted in concluding that he should have seen them. This would afford sufficient basis for a finding of constructive notice . . . ."

*Was reference to insurance so prejudicial that
the trial judge abused his discretion in denying
a mistrial and refusing to grant a new trial?*

Since counsel for Owens could not read the handwriting
in a medical report, he asked the plaintiff's medical
witness to read the illegible portion. The doctor read,
"The Piggly Wiggly Store, liability insurance; prob-
ably . . . ." The appellant immediately objected and
moved for a mistrial. The judge recognized the error of
permitting the question of insurance to come before the
jury but concluded that with proper instructions to dis-
regard the reference, no prejudice would result. He
instructed:

"There has been an objection made to an answer made
by the witness, which was read from some notes that he
had made at the time of admission; the Court has sus-
tained this objection, and will order you to disregard
that answer; the purpose of the objection, and the sus-
taining of this objection is that there was no foundation
for this particular answer. Now, you may proceed."

In *Smedley v. Milwaukee Automobile Ins. Co.* (1961),
12 Wis. (2d) 460, 469, 107 N. W. (2d) 625, we stated:

". . . where an insurer is not a party to the suit,
this court has reprimanded attorneys who brought forth
the fact of insurance before the jury [citing case]. Gen-
erally when such improper remarks are made to the
jury, the jury is admonished to disregard them by the
trial court."

In the instant case chastisement of the examining
attorney was not in order, since he was as surprised as
the appellant by the response. In fact, the exhibit was
marked for identification at the request of the appellant's
counsel, who was equally unaware of the contents of the
report.

Cases in this jurisdiction that have dealt with the problem consider such improper references are cause for new trial only if the verdict reflects that one of the parties was in fact prejudiced by the error. *Roeske v. Schmitt* (1954), 266 Wis. 557, 64 N. W. (2d) 394; *Smith v. Rural Mut. Ins. Co.* (1963), 20 Wis. (2d) 592, 123 N. W. (2d) 496. There must be some affirmative evidence of prejudice. Here we see no such evidence. The fact of insurance coverage, if prejudicial, would normally be reflected in excessive damages, yet neither of the defendants has seriously contended that Marguerite Caldwell has been excessively compensated for the injuries that she sustained on the night of January 19, 1964. This case is unlike *Smedley v. Milwaukee Automobile Ins. Co.* (1961), 12 Wis. (2d) 460, 107 N. W. (2d) 625, where there was an improper joinder as well as improper and *unadmonished* references to insurance coverage. *Smedley,* which is heavily relied upon by appellant, is a case where the fact of insurance was improperly a part of the very structure of the case. In this case, the reference to insurance was casual and susceptible of immediate isolation and remedy.

Counsel for appellant argues that the judge's admonition "that there was no foundation for this particular answer" gives rise to an inference that the answer would have been proper had the necessary qualifying questions been asked as a prelude to the disputed answer. There is lawyers' logic (the very best kind) to commend this contention. However, our concern is whether a lay jury was prejudiced, and we conclude they were not misled by the court's somewhat inartful reason of "no foundation" in light of the court's very prompt, correct, and unequivocal admonition and order to disregard that answer. We conclude that the trial court properly denied the motions for mistrial and new trial on this ground.

*Was the jury's determination of the negligence
attributable to each party disproportionate in
view of the facts of this case?*

This court has frequently said that the jury's apportionment of negligence will not be upset except in unusual cases. *Firkus v. Rombalski* (1964), 25 Wis. (2d) 352, 361, 130 N. W. (2d) 835; *Mullen v. Reischl* (1960), 10 Wis. (2d) 297, 103 N. W. (2d) 49; *Maus v. Cook* (1961), 15 Wis. (2d) 203, 112 N. W. (2d) 589.

However, this court has always reserved the right to set aside the jury's apportionment in a proper case. In *Gauthier v. Carbonneau* (1938), 226 Wis. 527, 534, 277 N. W. 135, we stated:

"This court has often declined to disturb the jury's findings as to the percentages of negligence attributable to the respective parties, although asserting the power to do so where the percentages found are grossly disproportionate [citing cases]."

In *Firkus v. Rombalski, supra,* page 361, we pointed out that generally when we do so the court can say as a matter of law the plaintiff's negligence equalled or exceeded that of the defendant. In that case we were not able to do so as a matter of law, but in view of the disproportion of negligence assigned to the parties, we exercised the discretionary power of this court as spelled out in sec. 251.09, Stats., to order a new trial on the grounds that justice had miscarried.

An examination of the record convinces us that the allocation of negligence between the defendants is so disproportionate in view of the acts of negligence with which they are charged that we conclude that justice has probably miscarried.

We are not able to say as a matter of law that the negligence of Owens is as great or greater than that of Piggly Wiggly. Nor is that determination controlling

as where the negligence of the plaintiff is compared to that of a defendant.

The negligence question in respect to each of the parties was identically worded: "Was the defendant . . . negligent with respect to maintaining the entrance of (its) (the Piggly Wiggly) store as safe as the nature of the place would reasonably permit?"

It is clear that Owens breached its duty by knowingly leaving unattended and unguarded a dangerous doorway. Piggly Wiggly breached its duty by leaving unattended and unguarded a dangerous doorway under such circumstances that the jury has found there was constructive knowledge of the hazard. Yet 25 percent of negligence was attributed to Owens and 70 percent—almost triple —negligence was attributed to Piggly Wiggly. We do not advance an opinion in regard to the apportionment of the negligence between the tort-feasors, but we conclude that a fair reading of the record leads to the inevitable conclusion that a finding of almost triple the negligence on Piggly Wiggly constitutes a probable miscarriage of justice.[2] Exercising our discretionary power under sec. 251.09, Stats., we therefore hold that there shall be a new trial on the issue of the apportionment of negligence between the defendant Piggly Wiggly Madison Company and the impleaded defendant James M. Owens, doing business as the Portage Glass Company.

No serious challenge has been made to the propriety of the jury's verdict in regard to the damages awarded to Marguerite Caldwell or to the negligence attributed to her. We conclude that it would be an injustice to direct that she participate in another trial on the issues that have been determined properly and finally by the jury.

In the retrial of the case, the jury should be instructed that the negligence of Marguerite Caldwell has been de-

---

[2] We do not imply that a negligent commission of an act necessarily constitutes as great or greater negligence than a negligent omission to act.

termined as a matter of law to be five percent of the total negligence. On the basis of the evidence it will be the jury's function only to allocate the remaining 95 percent of the negligence between the two defendants. The finding of causal negligence will stand, but evidence may be introduced for the purpose of determining the apportionment.

We also note that the judgment apportions the amount recoverable by the plaintiff in proportion to the negligence of each defendant, $3,500 from Piggly Wiggly Madison Company and $1,250 from James M. Owens. This is error. The plaintiff is entitled to have the whole of her judgment against each defendant. As we pointed out in *Bielski v. Schulze* (1962), 16 Wis. (2d) 1, 6, 114 N. W. (2d) 105:

". . . the rule of contribution does not apply to or change the plaintiff's right to recover against any defendant tort-feasor the total amount of his damage to which he is entitled."

Therefore, the judgment in behalf of the plaintiff must be modified to provide for recovery by plaintiff against both defendants of the sum of $4,750 damages, together with costs and disbursements. As a result of modifying the judgment to permit plaintiff to recover the whole of her damages against both defendants there remains the issue of contribution between the two defendants which will be redetermined by the apportionment of their negligence at the new trial.

*By the Court.*—The judgment in behalf of plaintiff against defendants is modified consistent with this opinion and, as so modified, is affirmed and the cause remanded for a new trial on the issue of contribution between the defendants, plaintiff to have costs on this appeal against the defendant Piggly Wiggly, and the defendant Piggly Wiggly is entitled to costs against the defendant Owens.

WILKIE, J. (*concurring*). I concur with the majority. I wish to add only one point. I suggest that the legislature amend the statutes to permit direct action against insurers in all negligence cases.[1]

I realize that the overwhelming majority of states do not permit joinder of insurance companies. The policy which supports the majority rule is that a greater burden is placed on the defense when an insurance company is joined because of the jury's tendency to find negligence and augment damages if the jury thinks an affluent institution such as an insurance company will bear the loss.

A legal basis often presented for denying joinder is that actions *ex contractu* cannot be joined with an action *ex delicto*.[2] This means that the contract action is separate from the tort action, and, generally, privity of contract would be recognized as a defense to a suit by the injured against the insurer.

However, only two states permit joinder. As stated, Wisconsin permits joinder "in any action for damages caused by the negligent operation, management or control of a motor vehicle." Louisiana is much broader, permitting joinder of an insurance company in all negligence actions.[3] Louisiana goes further than any state in the union to permit joinder of insurance companies in negligence actions even permitting action *in solido* against the insurer. Rhode Island also permits joinder of insurance companies in all negligence actions, but such joinder or direct action is permitted only when the tortfeasor cannot be served with process.[4]

Where there is compulsory-insurance contract, there is additional permissive joinder of insurance companies.

---

[1] Sec. 260.11, Stats., now permits joinder of insurance companies only in cases "arising out of the negligent operation, management or control of a motor vehicle."

[2] 8 Appleman, Insurance, p. 296, sec. 4861.

[3] Sec. 655, Louisiana Statute, Title 22.

[4] 5 Gen. Laws of R. I. (1956), sec. 27–7–2.

In these states the insured is required by statute or ordinance to purchase insurance to protect against injuries, and in these states, the prevailing rule is that the insurer may be joined in an action by an injured third party on the theory that, under the statutes requiring and controlling compulsory insurance, a direct or joint right is created in favor of the injured person against both the insured and the insurer.[5] Many states, though a minority, have cases to the contrary, however.[6]

The right to sue an insurance company directly varies in some states depending upon the type of insurance policy involved. A distinction is made between policies of liability insurance and policies of indemnity insurance. In liability policies, the injured person has a right of action upon qualifying under the policy terms without a judgment. On the other hand, indemnity policies, solely for the benefit of the insured, generally require that the insured bring action for reimbursement of financial loss by reason of accident or injury. Some courts have permitted the injured third party to sue the insurer where a liability policy is involved.[7] Where an indemnity policy is involved, however, the rule is that the injured person has no right of action against the insured.[8]

We all know that insurance companies also avoid the hazards of being sued directly by putting no-action

---

[5] Anno. 20 A. L. R. (2d) 1097, 1102. States with cases supporting the majority rule include Alabama, California, Georgia, Iowa, Kansas, Nebraska, New Mexico, North Carolina, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, Washington, West Virginia, and Wisconsin. See also 22 Marquette Law Review (1938), 75, 79, 80.

[6] States' cases to the contrary include Alabama, Arizona, Arkansas, Colorado, Georgia, Iowa, Michigan, North Carolina, South Carolina, Texas, Washington, and West Virginia.

[7] 8 Appleman, Insurance, p. 214, sec. 4831. Jurisdictions with cases to support this rule include Kentucky, North Carolina, South Carolina, Missouri, and Tennessee.

[8] 8 Appleman, Insurance, p. 216, sec. 4832.

clauses in their insurance contracts. These clauses generally provide that a suit on the policy is barred until loss has actually been sustained by the assured by reason of payment in money (a) of a final judgment rendered after a trial in a suit against the assured, (b) of the expenses incurred by the assured in the defense of a suit against the assured. This no-action clause has been universally held to prevent a joinder of the insurer and the insured.[9]

In summary, although the majority rule is against permitting joinder of the insurer in negligence cases, there are some states where statutes have been passed specifically permitting joinder of insurance companies.[10] But there is no discernable trend in that direction. The lack of a trend toward direct action against insurance companies does not minimize the need for legislation in Wisconsin. A direct-action statute permits a plaintiff to realize his recovery much more rapidly without any circuity of action, and also assures a more certain recovery. Direct action also permits the insurance policy to more adequately serve both parties protected by the policy. The idea that insurance is less an individual matter than a matter of protecting the public by insuring compensation for injuries has become more generally accepted.

The chief argument in support of such a statute is what took place in this case. Since I have been on the court it seems that every nonautomobile personal injury litigation has involved a skirmish concerning whether the jury was or was not prejudiced by the mention of insurance as to the defendant. I think it would be simpler, more realistic, and fairer if insurance com-

[9] 22 Marquette Law Review (1938), 75, 78.

[10] Attempts at joining insurance companies under normal joinder statutes where insurance is not expressly mentioned have failed. See 1953 Wisconsin Law Review, 688, 700, *et seq.*

panies in these actions could be joined. Wisconsin has led the way with joinder in automobile cases. It should now permit joinder in other types of negligence cases. There is no fair basis for the distinction. This is a change that is needed and the legislature must do the job.