COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

**June 26, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

EDWARD FYE, individually and ) C/A NO. 03A01-9707-CV-00287
as husband of the deceased, )
BARBARA MAY FYE, )
)
       Plaintiff-Appellant, )
)
)
) APPEAL AS OF RIGHT FROM THE
v. ) HAMILTON COUNTY CIRCUIT COURT
)
)
)
)
ANNE D. KENNEDY and )
JAMES D. KENNEDY, III, )
) HONORABLE SAMUEL H. PAYNE,
      Defendants-Appellees.) JUDGE


For Appellant                    For Appellees

C. MARK WARREN             SAMUEL R. ANDERSON
Duncan, Mosley & Warren      E. MATTIAS JANNERBO
Chattanooga, Tennessee       Luther-Anderson, PLLP
                            Chattanooga, Tennessee

                            CAROL A. MUTTER
                            Lookout Mountain, Tennessee


O P I N I O N


VACATED IN PART
AFFIRMED IN PART
REMANDED FOR NEW TRIAL                      Susano, J.

1

This is a wrongful death and loss of services action that arose out of a two-vehicle accident. Following the second of two jury trials, the trial court, acting pursuant to Rule 50, Tenn.R.Civ.P., set aside the jury's verdict for the plaintiff, Edward Fye, and directed the entry of a judgment for the remaining defendants, Anne D. Kennedy and James D. Kennedy, III.[1] Plaintiff appealed, raising two issues:

> 1. Did the trial court err in granting the Kennedys a directed verdict?
>
> 2. Did the trial judge who presided over the first trial improperly limit the percentage of fault that could be assessed to the Kennedys in the second jury trial?

The Kennedys argue, by way of a separate issue, that the "trial court improperly applied the collateral source rule in determining the amount of damages to which plaintiff was entitled."

I.

This case finds its genesis in an April 30, 1991, accident involving a vehicle driven by the defendant Anne D. Kennedy ("Kennedy") -- in which vehicle the plaintiff's decedent, Barbara May Fye ("Fye"), was riding as a guest passenger -- and a vehicle driven by Jeffrey W. Keller ("Keller"). Just prior to the accident, Kennedy was proceeding east in the left through-traffic lane of 23rd Street in Hamilton County, approaching the

---

[1] The Kennedys moved for a directed verdict at the conclusion of the plaintiff's proof and again at the close of all the proof. They renewed their motion after the jury returned its verdict.

intersection of 4th Avenue.  At the same time, Keller was proceeding west on 23rd Street.  As Keller approached the intersection, he moved his vehicle to the middle or turn lane of 23rd Street, intending to turn left onto 4th Avenue.  23rd Street has two lanes for traffic proceeding east and two lanes for traffic moving west.  The through-traffic lanes are separated by a middle or turn lane.  As Keller was turning left, his Chevrolet Blazer was struck in the right front quarter panel by the front of Kennedy's 1988 Chevrolet Suburban.  As a result of the collision, Fye was seriously injured.  She was hospitalized in the intensive care unit of Erlanger Medical Center, where she remained for just short of six months.  She died from her injuries on October 20, 1991.

The plaintiff brought suit for his wife's wrongful death and for loss of services.  In addition to Kennedy and Keller, the plaintiff named as defendants, (1) the owners of the two vehicles, (2) General Motors Corporation, and (3) Newton Chevrolet-GEO, Inc.  The latter two defendants were sued on a number of theories, all of which were related to the plaintiff's contention that Fye's seat belt was defectively designed.  The plaintiff claimed that Fye's injuries were enhanced because of the defectively-designed seat belt.

Prior to trial, Keller and his father settled their liability to the plaintiff for $1,500,000,[2] and they were dismissed as defendants.  Thereafter, the remaining claims proceeded to trial.  Following a ten-day trial, the jury

_____

[2]Neither of the juries in this case was made aware of the fact that the case against the Kellers had been settled.

3

exonerated General Motors Corporation and Newton Chevrolet-GEO, Inc. On the verdict form, the jury reported that it found Kennedy, Keller, *and Fye* each guilty of negligence that was a proximate cause of the accident and Fye's injuries and death.[3] It found[4] the parties fault as follows:

| | |
|---|---|
| Kennedy | 1% |
| Keller | 90 |
| Fye | 9 |

Damages in the wrongful death case, without regard to fault, were set at $1,505,750. The loss of services claim was valued at $500,000.

On post-trial motion, the trial judge, the Honorable William M. Barker, stated that while he could and would approve the jury's verdict with respect to damages, he could not agree with the jury's determination that Fye was guilty of actionable negligence. He stated that he did not believe she was guilty of any negligence, much less 9%. He opined that he was satisfied with the jury's finding with respect to the fault of Keller. After an extended discussion among counsel and the court, Judge Barker ordered a new trial solely on liability, but set limits on the re-trial:

---

[3] With respect to Fye, the jury simply found that she was guilty of negligence that proximately caused *her injuries*.

[4] The jury originally reported fault as follows: Kennedy 0%, Keller 90%, and Fye 10%. The trial judge found that the allocation of zero fault to Kennedy was inconsistent with the jury's finding that Kennedy was guilty of negligence that proximately caused the accident. He directed the jury to retire for further deliberations. One minute later, the jury returned and announced its revised verdict, which was accepted by the court.

4

> Now, here's what I'm going to do, and I know that there is no authority for this, but I also know there's no authority against it. I am going to direct that there be a new trial as between Mrs. Fye's estate and the Defendant Anne Kennedy and her husband James D. Kennedy, and the new trial will be limited. There will not be a new trial with regard to the total amount of the damage award assigned by the former jury....
>
> Two, the jury will not be told of the prior allocation of fault for this accident as between Mr. Keller and the Kennedys. However, once the jury verdict is accepted and rendered, the previous Jury's finding of 90 percent of the fault as to Mr. Keller will be written into their verdict, so that the Kennedys will be exposed in a new trial to only a reconsideration of whether their fault was zero percent or up to 10 percent.
>
> That is to say, a jury hearing this second trial may assign 60 percent of the fault to the Kellers and 40 percent to the Kennedys. If that's the case, the Kennedys will be liable for 10 percent of the damages previously determined. The jury may find 95 percent of the fault against the Kellers, and only 5 percent against the Kennedys. That being the case, the Kennedys would pay 5 percent of those damages.
>
> Now, I'm doing that because I simply feel that without any law on the subject, that's just and that's fair. I do agree with the defense that to reexamine all of the allocation of fault between the negligent defendants or negligence-charged defendants would be giving the Plaintiff too much of a bite at the apple again.

The issue of Fye's negligence was not to be presented for resolution to the second jury, for the simple reason that the Kennedys, who were then the only remaining defendants in the case, had never claimed that Fye was guilty of any negligence. Fye's alleged negligence was "in play" at the first trial only because the defectively-designed-seat-belt defendants had claimed that Fye had improperly fastened her seat belt. With the seat

5

belt issue out of the second trial,[5] there was to be no testimony presented to the second jury regarding Fye's use or misuse of her seat belt. *See* T.C.A. § 55-9-604(a).

At the second trial, the Honorable Samuel H. Payne presided. Following a two-day trial solely on the issue of the liability/comparative fault of Kennedy and Keller, the jury found both guilty of actionable negligence and assigned 60% of the fault to Keller and 40% to Kennedy. Coincidentally, this was one of the hypothetical scenarios that had been used by Judge Barker when he explained how the mechanism he had set in place would be applied to ensure that Kennedy would not, under any circumstances, be assigned more than 10% fault.

Kennedy pursued her motion for a directed verdict following the entry of the judgment confirming the second jury's verdict. As previously indicated, Judge Payne granted the motion, finding that reasonable minds could only conclude that Kennedy was not guilty of any negligence that proximately caused or contributed to the accident and Fye's injuries and death. He concluded that Keller's act of turning in front of Kennedy was the sole proximate cause of the accident. Judge Payne stated on the record, and confirmed in his subsequently-entered order that

> [s]hould the directed verdict for these
> defendants be vacated or reversed on appeal,
> the Court conditionally grants pursuant to
> Rules 50.03 and 59 of the Tennessee Rules of
> Civil Procedure the alternative Motion of
> Defendants Anne D. and James D. Kennedy, III,

---

[5]The plaintiff did not question the dismissal of General Motors Corporation and the dealer.

6

for a New Trial.  The Court finds in the
alternative, upon review of the evidence,
that the evidence preponderates against the
verdict of the jury and that if the judgment
in favor of the defendants James D. Kennedy,
III and Anne Kennedy is reversed on appeal, a
new trial should be granted these defendants.

## II.

We review a directed verdict under well-established
rules:

> In ruling on the motion, the court must take
> the strongest legitimate view of the evidence
> in favor of the non-moving party.  In other
> words, the court must remove any conflict in
> the evidence by construing it in the light
> most favorable to the non-movant and
> discarding all countervailing evidence.  The
> court may grant the motion only if, after
> assessing the evidence according to the
> foregoing standards, it determines that
> reasonable minds could not differ as to the
> conclusions to be drawn from the evidence.
> *Sauls v. Evans*, 635 S.W.2d 377 (Tenn. 1982);
> *Holmes v. Wilson*, 551 S.W.2d 682 (Tenn.
> 1977).  If there is any doubt as to the
> proper conclusions to be drawn from the
> evidence, the motion must be denied.
> *Crosslin v. Alsup*, 594 S.W.2d 379 (Tenn.
> 1980).

*Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994).  *See also*

*Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993).

"Negligence is ordinarily an issue to be decided by a

jury, and can be withdrawn from the jury only in those cases

where the facts are established by evidence free from conflict

and the inference from the facts is so certain that all

reasonable minds must agree."  *Id.*

7

"There can be more than one proximate cause of an injury." ***Stokes v. Leung***, 651 S.W.2d 704, 708 (Tenn.App. 1982). *See also* ***Kelley v. Johnson***, 796 S.W.2d 155, 159 (Tenn.App. 1990).

Generally speaking, whether a party breached a duty and whether that breach proximately caused injury "are...questions decided by the trier of fact." ***Id***. at 157. "These questions become questions of law only when the facts and inferences drawn from the facts permit reasonable persons to reach only one conclusion." ***Id***.

III.

The court charged the jury with respect to the plaintiff's allegations that Kennedy was guilty of common law negligence in failing to use reasonable care, in failing to have her vehicle under proper control, in failing to keep a proper lookout "for traffic on the street," in driving at an excessive rate of speed for the conditions then existing on the highway, and in failing to "observe traffic signals and respond appropriately." It also charged the jury with respect to T.C.A. § 55-8-110[6] and T.C.A. § 55-8-129.[7]

---

[6]T.C.A. § 55-8-110 provides, in pertinent part, as follows:

> Whenever traffic is controlled by traffic-control signals exhibiting the words "Go," "Caution" or "Stop," or exhibiting different colored lights successively one (1) at a time, or with arrows, the following colors only shall be used and the terms and lights shall indicate and apply to drivers or vehicles and pedestrians as follows:
>
> *    *    *
>
> (2) Yellow alone or "Caution," when shown following the green or "Go" signal:

8

IV.

On the subject of Kennedy's negligence, the most critical witness was George Donald Harris. He testified that just prior to the accident he was proceeding east in the right through-traffic lane of 23rd Street. When he reached a point that he estimated was 60 to 80 feet[8] from the solid white line for stopped vehicles at the 4th Avenue intersection, the light changed from green to yellow. He was then traveling at 30-35 MPH. When the light changed, he put his foot on the brake -- "it took very little breaking to stop" -- and pulled off to the right in a vacant Exxon station. He stopped his car before reaching the intersection.

Less than a second after the light turned from green to yellow, Kennedy's Suburban "immediately" came into Harris' view to his left in the left through-traffic lane. He estimated that the Kennedy vehicle was 5 to 10 feet behind him when the light changed to yellow. He testified that Kennedy was going 40 to 45

_____

> (A) Vehicular traffic facing the signal is thereby warned that the red or "Stop" signal will be exhibited immediately thereafter and such vehicular traffic shall not enter or cross the intersection when the red or "Stop" signal is exhibited;...

[7]T.C.A. § 55-8-129 provides, in pertinent part, as follows:

> The driver of a vehicle within an intersection intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but the driver, having so yielded and having given a signal when and as required by this chapter, may make such left turn, and the drivers of all other vehicles approaching the intersection from the opposite direction shall yield the right-of-way to the vehicle making the left turn.

[8]Harris testified at an earlier time that he was 60 feet from the cross walk when the light turned to yellow.

MPH. He saw no indication that Kennedy was going to stop, does not remember seeing any brake lights on Kennedy's vehicle, and did not detect that her speed was increasing or decreasing.

Harris said that he saw Keller's Blazer turning left in the intersection, and that it was moving when he first noticed it. Harris further testified that it was approximately 2 to 3 seconds from the time the light changed to yellow until the moment of impact.

The speed limit on 23rd Street at the site of the accident was 40 MPH. There was evidence from which one could conclude that 23rd Street and 4th Avenue is, generally speaking, a busy intersection. The accident occurred at approximately 3:15 p.m.

Another witness, Ms. McLaughlin, was in a vehicle to the rear of Keller's Blazer and in the same lane of traffic. She testified that the Blazer was at a complete stop out in the intersection -- past the solid white line -- when the light changed from yellow to red. According to her, when the light turned to red, Keller started his turn to the left. The "very instant" Keller turned to the left, he was hit by Kennedy's vehicle.

When the light turned red for Keller, it also turned red for Kennedy.

10

Keller testified that he was one-half to two-thirds of the way through the arc of his turn when he was struck by Kennedy in the right front part of his vehicle.

Kennedy testified that the accident occurred at "3:15, 3:17." She was taking her triplets, age 4,[9] to a doctor's appointment. One of the children's appointment was at 3:15, while the other children were due to see the doctor at 3:30. At the time of the accident, Kennedy was still some distance from the doctor's office.

Kennedy testified that she never saw the light change from green to yellow.

Admittedly, there is evidence from which one could conclude that Kennedy was not guilty of negligence that proximately caused or contributed to the accident; but we cannot consider this evidence on the question of whether the trial court erred in directing a verdict for the defendants Kennedy. As we are required to do, we have discarded all of this countervailing evidence in connection with our analysis of the trial judge's decision to grant a directed verdict.

We find that reasonable minds could reach different conclusions as to whether Kennedy was guilty of actionable negligence. There is evidence from which the jury could reasonably conclude: that Kennedy was traveling at an excessive

_____

[9]Fye was the triplets' "nanny." One of the triplets was in the front seat next to Kennedy while the other two were in the second seat on either side of Fye. Apparently, the children were not injured in the accident.

11

rate of speed as she approached this particular intersection; that, for whatever reason, she did not see the light go from green to yellow; that she was in a hurry to make the children's appointments; that, except for her excessive speed, she could have braked in time to stop before reaching the intersection, as did Harris; and that she was generally not proceeding in a safe manner as she was required to do. We find that the plaintiff's case made out a jury question on the issue of Kennedy's negligence and whether that negligence was a proximate cause of the accident. We find and hold that the trial court erred in directing a verdict for the Kennedys.

The trial judge at the second trial, in his role as the thirteenth juror, concluded that he could not approve the verdict. He stated that if he were in error in directing a verdict, he would grant a new trial. In view of this holding, we are compelled to remand this case for a new trial. *See* Rule 50.03, Tenn.R.Civ.P. *See also* **Huskey v. Crisp**, 865 S.W.2d 451, 454-55 (Tenn. 1993). We do not believe that this is an appropriate case to exercise our discretionary power, *see* Rule 50.03, to vacate the trial court's conditional grant of a new trial, in favor of reinstating the verdict of the second jury. We do not find the "exceptional circumstances" required to justify such a result. *See* **Huskey**, 865 S.W.2d at 455.

V.

We now turn our attention to the appellant's second issue, *i.e.*, whether the trial court erred when it capped

12

Kennedy's fault at 10%, regardless of what a subsequent jury concluded was an appropriate allocation of fault between Kennedy and the non-party, Keller. In reaching this issue, we recognize that the third trial may render this issue moot. This, of course, would be the case if the third jury were to conclude that Kennedy was not guilty of any legally cognizable fault; but, as it stands now, Judge Barker's ruling is a part of the law of this case. For this reason, we believe the parties are entitled to appellate review of this ruling at this time.

Judge Barker reasoned that it was not fair to Kennedy to reopen the issue of the non-party Keller's fault. Since he agreed that Keller was at least 90% at fault, he felt that it was fair to the parties to "lock[] [that determination] in concrete." Acting as the thirteenth juror, Judge Barker approved the jury's verdict in three particulars: as to Keller's comparative fault; as to the suit against the two defendants dismissed as a result of the verdict; and as to the issue of damages. He reasoned that the allocation of fault to Fye -- with which he adamantly disagreed -- adversely affected *only* 10% of the fault equation. He saw no need to reopen the entire question of comparative fault, since, in his judgment, the bulk of the jury verdict was clearly sustained by the preponderance of the evidence.

It is not uncommon for a trial judge to approve a jury's assessment of damages, while disagreeing with its verdict as to liability. In such cases, the court would, as Judge Barker did, refuse to grant a new trial as to damages but grant a new trial as to liability. Pre-**McIntyre**, it was clear that a trial

13

court could grant a new trial as to one party's claim while denying a new trial as to another party's claim.[10] *See, e.g.,* *Nashville Street Railway Co. v. Gore*, 106 Tenn. 390, 61 S.W. 777 (1901). *See also* *Lee v. Melson*, 387 S.W.2d 838 (Tenn.App. 1964). In *Lee*, this court made the following comment in justifying just such a ruling:

> The guiding principle is fairness to both parties. A verdict tainted with error or confusion ought not to stand. On the other hand, the parties are entitled to only one day in court. Once a party has been accorded a fair trial on the merits, unaffected by errors of law, he is not entitled to another trial merely because another party to the suit has been granted a new trial to reverse an error peculiar to him.

*Id*. at 841. This court's comments in *Lee* could be applied with equal force here. The plaintiff in the instant case had a full and fair hearing as to Keller's percentage of fault. The trial court approved the jury's determination in that regard. Why should the plaintiff be entitled to a new trial -- another "bite at the apple" -- as to that determination? Judge Barker's approach is reasonable and fair to both parties. It is actually more than fair to the plaintiff -- it gives him an *opportunity* to persuade the jury to increase Kennedy's fault from 1%, as found by the first jury, to 10%, a tenfold increase.

Other states have permitted a trial court to "tinker" with a jury's allocation of fault. *See* *Caldwell v. Piggly-Wiggly Madison Co*., 32 Wis.2d 447, 145 N.W.2d 745 (1966); *McHaffie v.*

---

[10]This would still be the case today, absent any complicating issues of comparative fault.

*Bunch*, 891 S.W.2d 822 (Mo.banc 1995); *Kibbons v. Union Electric Company*, 823 S.W.2d 485 (Mo.banc 1992).

Having said all of this, we hasten to note that subsequent to Judge Barker's ruling, the Supreme Court released its opinion in the case of *Turner v. Jordan*, 957 S.W.2d 815 (Tenn. 1997). In *Turner*, the Supreme Court held

> that the trial court may not reallocate the comparative fault after weighing the evidence as the thirteenth juror, but must instead grant a new trial.

*Id.* at 824. We recognize that the facts in *Turner* are in no way similar to the facts of the instant case. Furthermore, we have already expressed our opinion that the trial judge's ruling in the instant case capping Kennedy's fault at 10% is a fair and reasonable solution to a difficult and unusual situation. We also recognize that the ruling in *Turner* is *obiter dictum*, in that the Supreme Court expressly acknowledged that, in deciding *Turner*, it did not have to reach the issue of a trial court's power to reallocate fault following a jury verdict. However, we feel bound by *Turner* in view of the fact the Supreme Court granted permission to appeal on this specific issue, *see id*. at 816, and in view of the absolute nature of the court's pronouncement on the subject at hand. *Id*. at 824. *See also Holder v. Tennessee Judicial Selection Commission*, 937 S.W.2d 877, 882 (Tenn. 1996) ("Accordingly, inferior courts are not free to disregard, on the basis that the statement is *obiter dictum*, the pronouncement of a superior court when it speaks directly on

15

the matter before it, particularly when the superior court seeks to give guidance to the bench and bar.")

We cannot escape the conclusion that Judge Barker's ruling, authorizing as it did and still does, a possible increase in the jury's allocation of fault to Kennedy from 1% to 10%, is clearly a change -- a reallocation as it were -- of the jury's assessment of Kennedy's fault. The first jury said 1%; Judge Barker said it could "float" from 0% to 10%. The jury at the second trial assessed Kennedy's fault at 40%; had Judge Payne approved the verdict and applied Judge Barker's ruling, Kennedy's fault would have decreased, without the second jury's approval, from 40% to 10%. It should also be noted that under Judge Barker's ruling, any jury verdict assessing less than 10% fault to Kennedy would mean that the total fault finally assessed in the case would be less than 100%. For example, if a jury were to find that Kennedy was 5% at fault, Judge Barker's earlier ruling would confirm such a finding. In this situation, 95% of fault -- 90% to Keller in the first trial and 5% to Kennedy -- would be allocated with 5% fault unallocated. Such a judgment is contrary to *McIntyre's* edict that 100% of fault be set by the jury.

We believe that *Turner* precludes even a partial reallocation of a jury's finding as to comparative fault. Under *Turner*, a trial judge, who, in his or her role as the thirteenth juror, cannot approve some part of the jury's determination with respect to comparative fault is limited to granting a new trial. Accordingly, we vacate so much of Judge Barker's ruling below as

16

permits the trial court, on retrial, to reallocate the fault found by the third jury.

VI.

In the first trial, Judge Barker permitted the plaintiff to prove a bill from Erlanger Medical Center in the amount of $748,384.08. The Kennedys strenuously argue that this was error. They contend that the plaintiff should have been limited to proving $75,264, the portion of the bill actually paid by Medicaid.

Judge Barker addressed this issue both before and after the first trial. On the latter occasion, he reaffirmed his earlier ruling. He stated that if he were in error in admitting the entire bill, he would have to conclude that the jury's determination of $1,505,750 for the wrongful death claim was contrary to the preponderance of the evidence; in which event he would grant a new trial. *See* Rule 50.03, Tenn.R.Civ.P. In view of Judge Barker's contingent grant of a new trial, we will now address this issue.

As presented to the trial court, the relevant facts are these. Erlanger Medical Center rendered a bill to the Fye estate for $748,384.08, representing the total of the charges made by the hospital for the six months that Fye was in its intensive care unit.[11] At some unspecified point *thereafter*, the hospital submitted this bill to Medicaid and received payment in the

---

[11]Contrary to Judge Goddard's statement in his separate opinion, all of Erlanger's charges that were presented to the jury were incurred by Fye; it was only *after* they had been incurred that a portion of the total bill was forgiven.

17

amount of $75,264.  The parties agree that the hospital was not under any legal compulsion to submit the bill to Medicaid; but it is clear that the hospital chose to do so.  The parties represented to the court that the bill was submitted to Medicaid with the understanding that the hospital would accept the amount tendered by Medicaid, and *would not seek to recover the balance of the bill -- $673,120.08 -- from Fye's estate, her husband, or any other source*.  While the parties did not and do not present any statutory, regulatory, or contractual basis for this forbearance, it is clear, under the parties' stipulation, that the balance of the bill was, in some way, legally forgiven.  The issue for us is whether, since the balance of the bill was forgiven, the plaintiff is entitled to recover the fair value of the services rendered as opposed to the actual amount paid by Medicaid.  The parties agree that Medicaid was subrogated to the amount paid by it and was in fact paid by the plaintiff, apparently out of the proceeds of the settlement with the Kellers.

We are unaware of any authority in Tennessee on facts similar to those in this case.  The Kennedys argue that, because $673,120.08 of the bill was forgiven before trial, we should treat the forgiven portion as no bill at all rather than as an expense satisfied from a collateral source.  We disagree.  We believe the forgiveness of the bill should be analyzed in the context of the collateral source rule.

Under the provisions of T.C.A. § 20-5-113, a claimant in a wrongful death action is entitled to recover, among other things, the "necessary expenses resulting to the deceased from

the personal injuries..."  The Supreme Court has stated that "the [wrongful death statutes], in theory, preserve the right of action which the deceased would have had," if he or she had survived.  ***Jones v. Black***, 539 S.W.2d 123 (Tenn. 1976).  It follows that a claimant seeking to recover for the wrongful death of another is entitled to recover the "reasonable and necessary expenses for medical care, services, and supplies actually given in the treatment of [the deceased] as shown by the evidence." *See* T.P.I. 3 - CIVIL 14.11.

An injured party's right to recover his or her "reasonable and necessary expenses" must be viewed in connection with the collateral source rule:

> Normally, of course, in an action for damages in tort, the fact that the plaintiff has received payments from a collateral source, other than the defendant, is not admissible in evidence and does not reduce or mitigate the defendant's liability.

***Donnell v. Donnell***, 415 S.W.2d 127, 134 (Tenn. 1967). *See also* ***Steele v. Ft. Sanders Anesthesia Group, P.C.***, 897 S.W.2d 270, 282 (Tenn.App. 1994).

The subject before us is addressed in RESTATEMENT (SECOND) OF TORTS (1977) § 920A, which we adopt:

> § 920A.  Effect of Payments Made to Injured Party
>
> (1) A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another

19

> who is, or believes he is, subject to the same tort liability.
>
> *(2) Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.*

Emphasis added. Subsection (2) of § 920A is explained in the comments:

> *b. Benefits from collateral sources.* Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor....If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives....
>
> Perhaps there is an element of punishment of the wrongdoer involved. (See § 901). Perhaps also this is regarded as a means of helping to make the compensation more nearly compensatory to the injured party. (Cf. § 914A, Comment *b*).
>
> *c.* The rule that collateral benefits are not subtracted from the plaintiff's recovery applies to the following types of benefits:
>
> \*      \*      \*

20

(3) Gratuities.  This applies to cash gratuities and to the rendering of services. Thus the fact that the doctor did not charge for his services or the plaintiff was treated in a veterans hospital does not prevent his recovery for the reasonable value of the services.

(4) Social legislation benefits.  Social security benefits, welfare payments, pensions under special retirement acts, all are subject to the collateral-source rule.

*       *       *

In **Bennett v. Haley**, 132 Ga.App. 512, 208 S.E.2d 302 (1974), the Georgia Court of Appeals, quoting verbatim from 22 Aᴍ.Jᴜʀ.2d *Damages* § 570 (1988), emphasized that gratuitous benefits are covered by the collateral source rule:

[A]s a general rule, the fact that the plaintiff received gratuitous medical care, continued salary or wage payments, proceeds from insurance policies, or welfare and pension benefits, will not be taken into account in computing damages.

208 S.E.2d at 310.  To the same effect is **Mitchell v. Moore**, 406 So.2d 347, 351 (Ala. 1981).

In **Banks v. Crowner**, 694 P.2d 101 (Wyo. 1985), the Supreme Court of Wyoming, relying upon the above-quoted section of the Rᴇsᴛᴀᴛᴇᴍᴇɴᴛ, held that even assuming bills from a Veteran's Administration facility were for treatment "rendered gratuitously," an injured party suing in tort would be entitled to prove "the reasonable value of the medical services necessary to treat the injury."  **Id**. at 105.

21

In Tennessee, the focus has always been on the "reasonable" *value* of "necessary" services rendered. A plaintiff must prove that the services rendered were "necessary" to treat the injury or condition in question; and, even if the services were necessary, that the charges in question were "reasonable." The collateral source rule precludes a defendant from attempting to prove that a "reasonable" charge for a "necessary" service actually rendered, has been, or will be, paid by another -- not the defendant or someone acting on his or her behalf -- or has been forgiven, or that the service has been gratuitously rendered. However, a defendant is permitted to introduce relevant evidence regarding necessity, reasonableness, and whether a claimed service was actually rendered.

The theory underlying the collateral source ruling is that a tortfeasor should be responsible for "all harm that he [or she] causes." § 920A, Comment *b*. In applying the collateral source rule and the theory underlying it, there is no reason to differentiate between a payment from a collateral source and a gratuity from a collateral source. In either event, there is a benefit to the injured party that "should not be shifted so as to become a windfall for the tortfeasor." *Id*.

In the instant case, the Kennedys tacitly concede that six months of intensive care hospitalization was "necessary." There is no suggestion that the hospital bill for $748,384.08 is other than "reasonable." Therefore, it is clear that the bill is for services actually rendered, that it represents charges for "necessary" treatment, and that it is in a "reasonable" amount.

22

The jury was entitled to this evidence.  It was not entitled to know that the bill had been partially forgiven.

The judgment of the trial court directing a verdict for the appellees Anne D. Kennedy and James D. Kennedy, III, is hereby vacated.  The judgment of the trial court limiting an assessment of the Kennedys' comparative fault to 10% is likewise vacated.  The trial court's conditional grant of a new trial solely on the issues of the Kennedys' liability to the plaintiff and the comparative fault of Kennedy and Keller is hereby affirmed, as is the trial court's decision regarding the bill from Erlanger Medical Center.  The issues for the jury in the third trial will be the same as the ones in the second trial.  This case is remanded to the trial court for a new trial.  Costs on appeal are taxed to the appellees.

_____
Charles D. Susano, Jr., J.

CONCUR:


_____
Houston M. Goddard, P.J.


_____
William H. Inman, Sr.J.

FILED

**June 26, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

EDWARD FYE, Individually and          )
as husband of the deceased,           )
BARBARA MAY FYE                       )
                                      )
        Plaintiff-Appellant           )
                                      )
                                      )
        v.                            )    HAMILTON COUNTY
                                      )    03A01-9707-CV-00287
                                      )
ANNE D. KENNEDY and                   )
JAMES D. KENNEDY, III                 )
                                      )
        Defendants-Appellees          )


OPINION CONCURRING IN PART AND DISSENTING IN PART


                              Goddard, P.J.


        I concur in all of the issues addressed in the majority

opinion except the one questioning the Trial Court's permitting

the Plaintiff to prove the entire bill from Erlanger Medical

Center.


        I recognize that Judge Susano has set out considerable

authority to support the position reached by the majority.

However, it appears this is a question of first impression in

Tennessee and I cannot concur that the law should enable an

injured plaintiff to be able to prove and, presumably, recover monetary damages for medical expenses which he has in fact not incurred, much less paid or became obligated to pay.

Assume, for instance, that in the case at bar the deceased had only received a relatively minor injury from which she fully recovered.  However, the cost of her treatment and convalescence totaled $250,000, but she was only charged and obligated to pay the sum of $2500.  Would she then be entitled to prove the $250,000 as a part of her damages?  I think not. In my view, fundamental fairness requires a different resolution than that reached by the majority opinion.

I would hold that the introduction of the Erlanger bill was prejudicial error and--in light of Judge Barker's statement relative to granting a new trial--remand the case for trial as to liability and damages, which would include only those medical bills which were paid or there was an obligation to pay.

_____
Houston M. Goddard, P.J.

26