IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

June 6, 2002 Session

## RUSSELL M. LIPSEY, Individually and d/b/a SECURITY WATCH and SECURITY WATCH, INC.
v.
## PROTECH FIRE SYSTEMS, INC. and JERRY PANNELL

**Appeal from the Circuit Court for Shelby County**
**No. 69579-3 T.D.     Karen R. Williams, Judge**

---

**No. W2001-01785-COA-R3-CV - Filed March 17, 2003**

---

This is a negligence case. The owner of a three-story historic building was remodeling it. He called a fire sprinkler company to move a sprinkler pipe. The repairman cut one of the sprinkler pipes and, thinking it was a "dead pipe," pushed it behind some sheetrock without capping it. The sprinkler system was regulated by an air compressor that filled the pipes with pressurized air until the system was triggered to allow water to flow through the pipes. The repairman left before the compressor completely charged the system, that is, before the air pressure reached the required level to hold the water back. Two days later, water began rushing out of a sprinkler pipe, causing extensive damage to the building. The owner sued the fire sprinkler company for damage to the building and its contents as well as for interruption of his business. At the trial, there was conflicting testimony about whether the water came out of the pipe that the repairman cut or whether it came out of another pipe. The jury found that both parties were zero percent responsible; thus, the owner recovered no damages. The owner moved for judgment notwithstanding the verdict or for a new trial. Both motions were denied. The owner appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Edward M. Bearman, Memphis, Tennessee, for appellant, Russell M. Lipsey, Individually and d/b/a Security Watch and Security Watch, Inc.

John R. Cannon, Jr., Memphis, Tennessee, for appellees, Protech Fire Systems, Inc. and Jerry Pannell.

# OPINION

Plaintiff/Appellant Russell M. Lipsey ("Lipsey") owns a three-story building at 85 S. Second street in Memphis, Tennessee. The first floor of the building was leased as retail space to an art gallery. Lipsey's alarm sales company, Security Watch, Inc.,[1] and his alarm monitoring company were housed on the second story of the building, and the third floor was an apartment that was to be Lipsey's future home. Both the second and third floors were being remodeled. The building had a skylight on the roof. The ceiling of the third floor was a short distance from the roof, and there was a boxed-in cube between the third-floor ceiling and the skylight. The cube had a fire sprinkler system pipe running across it. As part of the remodeling, Lipsey wanted to have the sprinkler pipe removed from the skylight.

The type of sprinkler system that Lipsey's building had is known as a "dry" system. Water flows into the system from the street level. Most of the time, however, this water is kept at bay by a flap that is forced shut by compressed air coming from an air compressor attached to the fire sprinkler pipe system. The air compressor, in the basement in Lipsey's building, fills the system with air. When the air pressure reaches a certain level, the compressor shuts off. Although the system is considered "sealed," inevitably it will have minor air leaks, and the air compressor will turn on and off from time to time to maintain the pressure in the pipes. Because the air pressure in the sprinkler system pushing down on the flap is higher than the pressure coming from the water at the street level pushing up at the flap, the flap remains shut. When a fire occurs within the building, a plastic ring on a sprinkler head melts, allowing the compressed air in the pipes to rush out at the location of the sprinkler head. This results in the water pressure from below becoming greater than the air pressure within the sprinkler system; consequently, the flap opens, allowing water to flow into the system. The water fills the sprinkler system's pipes and begins rushing out from the place in the system where the compressed air first escaped, usually the sprinkler head, dousing the fire.

To have the sprinkler pipe removed from the skylight for the remodeling, Lipsey called Defendant/Appellee Protech Fire Systems, Inc. ("Protech"). On August 23, 1994, Protech sent its employee, Jerry Pannell ("Pannell") to Lipsey's building to remove the pipe.[2] Pannell, using a cutting tool, cut and capped the pipe on the east side of the skylight. Then, using a hacksaw, he cut the pipe on the west side of the skylight. In doing so, Pannell heard something fall behind the wall onto the inside of the ceiling. He then pushed the remaining pipe behind the sheetrock wall surrounding the inside of the skylight. Pannell believed that this pipe was a "dead pipe" and, consequently, did not cap it.

Pannell then went to the basement and turned on the air compressor to recharge the sprinkler system. Before the air compressor reached the appropriate pressure for Lipsey's system, Pannell left

---

[1] Lipsey and Security Watch, Inc. are hereinafter collectively referred to as "Lipsey."

[2] Pannell was Protech's employee, and both were represented by the same counsel at the trial court. Because of this, and because their arguments at the trial level were identical, we refer to Protech and Pannell collectively as "Protech." When referring solely to Pannell, we use only his name.

the building. Thus, when Pannell left, the sprinkler system had not finished filling with air, and he did not know whether the system had any leaks.

Some forty hours later, on August 25, 1994, two of Lipsey's employees working on the third floor below the skylight heard a "hissing" noise. They looked up to see water begin rushing out of the pipe that was on the west side of the skylight. Although Pannell, two days earlier, had been able to shut down the sprinkler system using a wheel valve in the basement, when Lipsey's employees attempted to do the same, they were unable to do so. Fire trucks and firefighters were dispatched to the building as water flowed from the ceiling of the third floor, through the second and first floors, and eventually to the basement. The fire department finally was able to stop the water flow by placing a special valve over the pipe and closing the valve. The flooding caused significant damages.

Subsequently, Lipsey filed this lawsuit against Protech, seeking $250,000 in damages for the damaged caused to the building and its contents, and $125,000 in damages for loss of business and business interruption. Lipsey later amended the complaint to seek $1,110,000 for loss of business and business interruption, for total damages of $1,360,000. Lipsey asserted that Protech negligently caused the flooding, and also plead the doctrine of *res ipsa loquitur*. In its answer, Protech asserted comparative fault, arguing that Lipsey's employees working in the vicinity of the pipes near the time of the accident had at least some responsibility for the flooding.

The jury trial began on January 16, 2001 and lasted seven days. Pannell attended the trial but was not called to the witness stand by either party. Portions of his videotaped deposition, however, were played for the jury. In his deposition, Pannell testified that he was not aware of any rule about the length of time he was to stay at the customer's site after re-engaging the sprinkler system. Pannell noted that, at the time he left Lipsey's building, the sprinkler system read an air pressure between twenty-seven and twenty-eight pounds per square inch ("p.s.i."). When Pannell visited the site after the accident, the pipe that he cut on the west side of the skylight was no longer there. There was a pipe, however, attached to the ceiling farther back. Thus, a portion of pipe approximately six feet long, extending from where Pannell originally cut the pipe to the now-existing pipe, was missing.

Lipsey testified that, on the day of the incident, he was summoned to the building. When he arrived, he went to the third floor and saw water coming out of a pipe that was cut and was up against the place where, prior to the incident, there had been sheetrock around the skylight.

Earl Beck ("Beck") and Larry Holloway ("Holloway"), construction workers employed by Lipsey to do sheetrock work on the building, both testified at the trial. Beck testified that the plaster around the skylight cube was deteriorating. Consequently, prior to the time Pannell cut the pipe, he and Holloway installed wood supports around the skylight, and then attached new sheetrock on top of the old plaster, cutting the sheetrock around the pipe. They planned to patch the holes left by the pipe after Pannell finished removing it. On the day Pannell came to remove the pipe, Beck saw Pannell cut the east side of the pipe and put a cap or a plug on the pipe. As to the west side of the

3

pipe, Beck did not see whether Pannell unscrewed or cut the pipe, but he saw Pannell shove the west side of the pipe back behind the sheetrock wall. Beck asked Pannell about this pipe. In response to Beck's inquiry, Pannell told Beck that the pipe on the west side was "dead" and did not need to be plugged. Beck noted that the next day, Wednesday, while he was down in the basement, the sprinkler system air compressor was running. The following day, Thursday, after water began coming out of the pipe near the skylight, Beck went to the basement with another of Lipsey's employees, and neither was able to cut off the water flowing through the sprinkler system pipes by using the wheel valve.

Lipsey's employee Holloway testified that he was present during the conversation between Pannell and Beck regarding the "dead" pipe. After Pannell left to go to the basement, Holloway worked on the third floor for the remainder of the day and did not see Pannell. Two days later, Holloway was working underneath the skylight when he heard a hissing sound. He testified that, a few moments later, he saw water shooting out of the hole on the west side of the skylight. While Beck went downstairs to try to shut off the water, Holloway climbed a ladder and looked through an opening in the sheetrock. Holloway testified that he saw water spewing from the pipe that Pannell had pushed back behind the wall, and saw that the pipe had cut marks on it. Holloway said that he did not work on the pipe in question from the time Pannell worked on the pipe until the time water began coming out of it.

Protech called as witnesses two firefighters who were at the scene after the flooding began. Donald W. Powers ("Powers") testified that, at the time of the flood, the pipe he saw on the third floor expelling water was a threaded pipe, and that he did not see any pipe with hacksaw marks on it. He said that he could not turn off the water flow by using the wheel valve, and that the firefighters used a "coupler" to shut off the water.

Firefighter Michael Devore ("Devore") also testified. Devore was questioned about whether the pipe gushing water had a threaded end or a regular end. Devore could not recall whether it had a threaded end, but he testified that he did not remember seeing hacksaw marks on the pipe. He acknowledged that he had previously said that the pipe was threaded.

Both parties offered expert testimony. Lipsey's expert was Alan Pearlman ("Pearlman"), a mechanical engineer. Pearlman testified that he had investigated approximately fifteen to twenty sprinkler system failures. Pearlman first visited Lipsey's building on September 29, 1999, five years after the accident. In addition to visiting the building, Pearlman read a report by another engineer, reviewed depositions and documents, and inspected a ten-foot portion of sprinkler pipe that Pannell had removed from the skylight. Pearlman theorized that, contrary to Pannell's belief at the time, the pipe Pannell cut on the west side of the skylight and pushed behind the wall was not a dead pipe. Pearlman's theory was that when the cut end of the pipe sprung back towards the inside of the sheetrock, it pushed up against the sheetrock with enough force to allow the system to sustain some air pressure once the air compressor was engaged. He believed that, after some time, either moisture

4

or air passing through the sheetrock caused the sheetrock to erode, allowing the air in the pipe system to escape, resulting in water rushing through the pipe system and coming out at the place previously cut by Pannell.

On cross-examination, Pearlman acknowledged that he had taken no measurements and performed no tests to substantiate his theory. Pearlman also acknowledged that he did not attempt to move the pipe, but that if the pipe would not move, his theory would be invalidated. Pearlman admitted that his theory was inconsistent with the firefighters' earlier testimony that the pipe spewing water was a threaded pipe that was three feet behind the wall of the skylight.

Protech's expert was Dr. William Janna ("Dr. Janna"). Dr. Janna was a professor of mechanical engineering and the Associate Dean for Graduate Studies at the College of Engineering at the University of Memphis, and was widely published in the areas of fluid mechanics, heat transfer, and design of fluid thermal systems.

Dr. Janna reviewed depositions and reports, interviewed Pannell, took measurements at the accident site on his first visit in April 2000, and conducted experiments. He testified that the piping system was not flexible, and did not have a lot of "play" in it such that it could be moved around. He criticized Pearlman's theory because there was no sheetrock or wood for the pipe to butt against. Dr. Janna said that even if the pipe on the west side had abutted against wood or sheetrock, it would not create enough resistance to allow the pipe system to fill with the requisite amount of compressed air. Dr. Janna tested this by using a piece of pipe approximately two and one-half feet long, capping it on one end and then pushing the open end against a piece of wood. Using an air compressor, he forced air into the pipe to determine how much air it could hold. In a second experiment, he used a hammer to embed the open end of the pipe into the wood. In neither case did the pipe hold upwards of twenty-eight p.s.i. of compressed air, the amount that Pannell testified was the air pressure level when he left Lipsey's building. Rather, fifteen p.s.i. was the maximum pressure Dr. Janna could achieve. Dr. Janna testified that the only way the system could have charged up to twenty-eight p.s.i. was if it had been completely sealed.[3]

At the close of Lipsey's proof, Protech moved for a directed verdict, arguing failure to show causation. This motion was denied. At the close of Protech's proof, Lipsey moved for a directed verdict regarding Lipsey's comparative fault. This motion was also denied. The trial judge noted that there could be an inference that Lipsey was negligent because neither Pannell nor Protech had been in the building between the time the flood started and the time when the firefighters arrived. At the close of Lipsey's rebuttal proof, Lipsey again moved for a directed verdict, asserting that Protech had offered no proof of Lipsey's negligence. Protech argued that the issue should go to the

---

[3]The trial also included considerable testimony regarding whether Lipsey actually intended to continue growing his alarm business and the value of his lost business because of the interruption. Additionally, there was mention of Lipsey's involvement in another lawsuit in which Lipsey sought the same damages.

jury because the missing pipe indicated that someone had removed a piece of pipe, which then caused the flood. The trial judge denied Lipsey's motion, explaining:

> Inferences are the permitted bridges between one fact and another or between facts and a conclusion. . . . There are a number of facts that have been placed before this jury by various witnesses. Not all of those facts can coexist peacefully, let alone all the inferences that can be drawn from it. But I think the jury is here to sort that out and I'm going to let it go to the jury.

The jury then deliberated. The jury determined that Protech was zero percent responsible for the accident, and that Lipsey, likewise, was zero percent responsible for the accident. Lipsey moved for judgment notwithstanding the verdict or, in the alternative, a new trial. Lipsey argued that he established his *prima facie* case of negligence, and that Protech had not rebutted it. Lipsey also argued that the jury's verdict was not supported by the greater weight of the evidence, and also that the trial court erred in failing to instruct the jury that they could draw a negative inference from Pannell's failure to testify. The trial court denied Lipsey's motions, stating that

> the Court approves the verdict of the jury and finds that there is competent, material evidence to support the verdict of the jury so that the Motion for Judgment Notwithstanding Verdict should be overruled, and that the evidence preponderates in favor of the Defendants so that the Motion for New Trial should be denied.

Lipsey now appeals.

On appeal, Lipsey argues that the trial court erred in denying his motion for judgment notwithstanding the verdict and his motion for a new trial. Lipsey contends that the testimony of Lipsey, Holloway, Beck, and Pearlman, combined with the presumption of *res ipsa loquitur* and negligence *per se*, established his *prima facie* case of negligence, and that inferences from the testimony of Protech's witnesses were not sufficient to rebut it.

The standard of review for a motion for judgment notwithstanding the verdict is the same as that applied to a motion for directed verdict made during the trial. **Holmes v. Wilson**, 551 S.W.2d 682, 685 (Tenn. 1977). The court ruling on the motion is to review the record, construe the evidence in the light most favorable to the non-moving party, allow all inferences in his favor, and remove any countervailing evidence. **Eaton v. McClain**, 891 S.W.2d 587, 590 (Tenn. 1994); *see Holmes*, 551 S.W.2d at 685; Tenn. R. App. P. 13(d). After assessing this information, the appellate court reverses the denial of the motion only if "reasonable minds could not differ as to the conclusions to be drawn from the evidence." **Eaton**, 891 S.W.2d at 590. Thus, putting aside for the moment the evidence that supports a verdict in favor of the moving party, if the remaining direct, circumstantial, and inferential evidence would tend to uphold a verdict in favor of the non-moving party, then the motion must be denied. **Fye v. Kennedy**, 991 S.W.2d 754, 765-66 (Tenn. Ct. App. 1998). The appellate court does not reweigh the evidence, nor does it reassess the credibility of witnesses, as it is the responsibility of the jury to assess the weight, faith, and credibility of each of the witnesses. **Tenn.**

*Dept. of Transp. v. Wheeler*, No. M1999-00088-COA-R3-CV, 2002 Tenn. App. LEXIS 727, at *12 (Tenn. Ct. App. Oct. 11, 2002); *see Shepherd v. Wal-Mart Stores, Inc.*, No. W1998-00903-COA-R3-CV, 2000 Tenn. App. LEXIS 218, at *9 (Tenn. Ct. App. Mar. 31, 2000).

We must also evaluate the application of the doctrine of *res ipsa loquitur* in this case. The fact that an accident or injury occurred does not normally give rise to a presumption that the defendant was negligent. Under the doctrine of *res ipsa loquitur*, which means the thing speaks for itself, the circumstances surrounding an accident or injury permit an inference that the defendant was negligent, in the absence of an explanation from the defendant. 57B Am. Jur. 2d, *Negligence* § 1819 (1989). It applies when an accident is of such a nature that, in the light of common experience, the accident could not have occurred in the absence of negligence by the defendant. *Id.* §§ 1825-26. The doctrine of *res ipsa loquitur* is a form of circumstantial evidence that permits, but does not compel, a jury to infer negligence based upon the circumstances of an injury when direct evidence is not available. *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86, 91 (Tenn. 1999) (citations omitted). Even when the presumption is permitted, the plaintiff still must prove circumstances on which a jury might reasonably rely to conclude that the defendant was negligent. *Id.* "The weight of any inference to be drawn from the evidence is for the determination of the jury." *Id.*

The determination of witness credibility clearly falls within the purview of the trier of fact, here, the jury. *Miller v. Williams*, 970 S.W.2d 497, 499 (Tenn. Ct. App. 1998) (citing *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994)). "It is well established that when reviewing a judgment based on a jury verdict, appellate courts are limited to determining whether there is material evidence to support the verdict." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 898 (Tenn. 1992) (citations omitted). The Tennessee Supreme Court has held that:

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978) (citations omitted). Thus, if there is material evidence to support the jury verdict, the verdict will be affirmed.

Lipsey's counsel asserts that the trial court erred in denying Lipsey's motion for judgment notwithstanding the verdict because Lipsey established his *prima facie* case of negligence and then Protech was unable to rebut it. Lipsey contends that the theory propounded by Protech's expert, Dr. Janna, is nothing more than a hypothetical based on assumed facts, and that the inferences

presumably made by the jury after listening to the firefighters' testimony are in direct opposition to the uncontradicted testimony of Holloway.

In this case, there was clearly conflicting testimony about what occurred the day the water began flooding Lipsey's building. The jury was required to assess the credibility of the witnesses proffered by both parties. The testimony from Lipsey's witnesses tended to establish that the water began coming out of the pipe that Pannell, believing the pipe was "dead," cut and did not cap. However, in reviewing whether there was material evidence to support the jury's verdict, we consider the evidence in the light most favorable to Protech. The firefighters testified that the pipe from which the water was flowing had thread marks on it, and that the threaded pipe was a few feet back from the wall of the skylight, indicating that a portion of the pipe was missing. This missing pipe was never recovered. Both parties offered the testimony of expert witnesses. The testimony of Protech's expert, Dr. Janna, is clearly sufficient for the jury to conclude that the theory of Lipsey's expert, Mr. Pearlman, had been discredited. This evidence is sufficient for the jury to conclude that the pipe from which the water burst forth was not the pipe that Pannell cut, and that therefore, Protech was not responsible for the flooding.

Lipsey argues that a *prima facie* case of negligence was established under the doctrine of *res ipsa loquitur*. Assuming arguendo that this was the case, the evidence was sufficient to rebut any presumption that the accident resulted from Pannell's negligence. Under all of these circumstances, we must conclude that the trial court did not err in denying Lipsey's motion for judgment notwithstanding the verdict.

Lipsey also argues that the trial court erred in denying his motion for a new trial, contending that the trial judge did not properly act as the thirteenth juror. In acting as the thirteenth juror, the trial judge independently evaluates the evidence and assesses the credibility of witnesses, and does not give deference to the jury's determinations. *Fye v. Kennedy*, 991 S.W.2d 754, 766 (Tenn. Ct. App. 1998). If the trial judge finds that the preponderance of the evidence goes against the jury verdict, he is required to set aside the verdict and grant a new trial. *Id.*; *see also Ridings v. Norfolk S. Ry. Co.*, 894 S.W.2d 281, 288 (Tenn. Ct. App. 1994).

A motion for new trial is reviewed on appeal by determining whether the trial judge properly acted as the thirteenth juror. *Woolfork v. Hampton Inns, Inc.*, C.A. No. 02A01-9411-CV-00266, 1996 Tenn. App. LEXIS 72, at *2 (Tenn. Ct. App. Feb. 7, 1996). Here, the trial judge's comments show clearly that she evaluated the evidence independently and acted appropriately as the thirteenth juror.

Lipsey argues next that the trial court erred in declining to give the jury a missing witness instruction based on Pannell's failure to testify. The missing witness instruction permits the inference that a witness's testimony would be adverse to the party that failed to call the witness when the witness is available and possesses "peculiar knowledge concerning the facts essential to a party's case . . . especially if the witness would naturally be favorable to the party's contention . . . ." *T.H. Eng'g & Mfg. v Mussard*, No. E2001-02406-COA-R3-CV, 2002 Tenn. App. LEXIS 367, at *10-11

(Tenn. Ct. App. May 23, 2002)  The missing witness rule, however, is "inapplicable where the witness was equally available to both parties and it seems no more likely that his testimony would favor the plaintiff than the defendant." *Bland v. Allstate Ins. Co.*, 944 S.W.2d 372, 379 (Tenn. Ct. App. 1996) (citing *Waller v. Skeleton*, 212 S.W.2d 690, 697 (Tenn. Ct. App. 1948)).

Here, the evidence does not indicate that Pannell's knowledge was more favorable to one party or the other.  Moreover, Pannell was at the trial on each day and was available to be called to testify by Lipsey as well as Protech.  This argument is without merit.

Accordingly, we conclude that the trial court did not err in denying Lipsey's motion for judgment notwithstanding the verdict, nor in denying Lipsey's motion for a new trial.

The judgment of the trial court is affirmed.  Costs are taxed to appellant, Russell M. Lipsey, Individually and d/b/a Security Watch and Security Watch, Inc., and their surety, for which execution may issue, if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE